## Commonwealth vs. Paulo Tavares.

Plymouth. January 4, 2011. - April 8, 2011.

Present: Ireland, C.J., Spina, Cowin, Cordy, Botsford, & Gants, JJ.[1]

*Electronic Surveillance. Evidence,* Wiretap. *Search and Seizure,* Electronic surveillance, Warrant, Affidavit, Probable cause. *Probable Cause.*

Discussion of the Massachusetts wiretap statute, G. L. c. 272, § 99, and its predicate of the existence of an investigation concerning a "designated offense." [294-298]

A Superior Court judge properly allowed the criminal defendant's pretrial motion to suppress evidence, where the Commonwealth, through a State trooper's affidavit submitted in support of an application for a warrant, failed to demonstrate that interception and recording of the defendant's oral communications would disclose evidence of the commission of a designated offense in connection with a continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services, as required by G. L. c. 272, § 99, in that while the facts adduced in the trooper's affidavit evinced some measure of organization, it failed to establish the type of ongoing, multi-transactional criminal enterprise that is required to meet the statute's narrow definition of organized crime, and contained information that the defendant and his associates in a street gang lacked other hallmarks of organized crime. [298-303] Gants, J., concurring, with whom Cowin, J., joined.

Indictments found and returned in the Superior Court Department on June 29, 2007.

A pretrial motion to suppress evidence was heard by *Barbara A. Dortch-Okara,* J.

An application for leave to file an interlocutory appeal was allowed by *Spina,* J., in the Supreme Judicial Court for the county of Suffolk.

*Robert C. Thompson,* Assistant District Attorney, for the Commonwealth.

*Frank H. Spillane* for the defendant.

[1]Justice Cowin participated in the deliberation on this case prior to her retirement.

CORDY, J. The question presented in this interlocutory appeal is whether a drive-by killing in Brockton constituted a "designated offense" occurring in "connection with organized crime," G. L. c. 272, § 99 B 4 and 7, such that oral communications of the defendant, Paulo Tavares, surreptitiously recorded by a confidential police informant, qualify for an exception to the proscription of "secret transmission or recording of oral communications without the consent of all parties" provided in the wiretap statute (G. L. c. 272, § 99). *Commonwealth* v. *Blood*, 400 Mass. 61, 66 (1987). Based on the record before her, a judge in the Superior Court concluded that it did not, and suppressed the recordings pursuant to G. L. c. 272, § 99 P.[2] The Commonwealth sought leave to appeal, which was granted by a single justice of this court. See Mass. R. Crim. P. 15 (a) (2), as appearing in 422 Mass. 1501 (1996). We affirm.

1. *Background.* The following facts and circumstances were set forth in the affidavit of State Trooper Scott D. McGrath that was filed in the Brockton Division of the District Court Department in support of his application for a warrant to intercept and record the defendant's conversations. On the night of May 21, 2007, at 11:30 P.M., Brockton police officers found John Lima dead from multiple gunshot wounds in the driver's seat of a red Nissan Altima automobile. At the scene, an officer spoke with Jorell Archer, a passenger in the vehicle. Archer stated that, while on Main Street, a vehicle "tailed" the Nissan Altima at an unusually close distance and activated its high beam lights. The driver of the vehicle changed lanes and accelerated until he was driving adjacent to the passenger side of the Nissan Altima as it was driven by Lima. The occupants of the vehicle began shooting, shattering the passenger side window of the Nissan Altima and striking Lima. At the scene of the shooting, investi-

---

[2]General Laws c. 272, § 99 P, provides, in relevant part: "Any person who is a defendant in a criminal trial in a court of the commonwealth may move to suppress the contents of any intercepted wire or oral communication or evidence derived therefrom, for the following reasons: (1) [t]hat the communication was unlawfully intercepted[;] (2) [t]hat the communication was not intercepted in accordance with the terms of this section[;] . . . (5) [t]hat the evidence sought to be introduced was illegally obtained . . . ." The three other enumerated grounds each concern interceptions made under a lawfully issued warrant in accordance with the wiretap statute, and, as discussed *infra*, are not at issue here.

gators found fourteen spent shell casings, ten from bullets fired from a .22 caliber gun, and four from bullets fired from a .40 caliber gun.

Police interviewed Lima's sister, the registered owner of the red Nissan Altima. She stated that her brother arrived at her home in Brockton with Archer on the evening of May 21, 2007, to borrow the vehicle.

A witness observed the entire shooting from his front porch. This witness reported to police that he saw three black males in a dark-colored Chevrolet "Malibu Max" sedan drive past seconds after hearing several gunshots. He printed a picture from an Internet Web site of a Chevrolet Malibu Max vehicle similar in appearance to the vehicle he observed, and provided it to the officers. The following day, May 22, State troopers observed a gray Chevrolet Malibu in Brockton, and after losing sight of the vehicle for several minutes, spotted it again on a nearby street and alerted its driver to pull over. The vehicle's driver was Christopher Hanson, and the passengers were Tavares and Eddie Ortega. The gray Chevrolet Malibu was registered to Enterprise Rent-A-Car of Boston, Inc., and had been rented by Deolinda Andrade of Brockton. Because Hanson, Tavares, and Ortega were not authorized to operate the Chevrolet Malibu under Andrade's rental agreement, police towed the vehicle to the Brockton police department, and called Andrade to the station to claim it. The police apparently did not detain the three occupants.

At the station, Andrade told police that she rented the Chevrolet Malibu because her vehicle had burned. She stated that the defendant, Tavares, was her former boy friend, and she allowed him and his friend "Chris" (whom police believed to be Hanson) to borrow the vehicle. Police officers then brought the witness who had observed the shooting from his porch to a police garage where the gray Chevrolet Malibu was stored. On entering the garage, without prompting, the witness asked, "How did you get it here so fast?" At the garage, the witness told police that the driver of the shooters' vehicle "took the corner very wide" while fleeing, and drove over a curb. This, the witness told police, means the vehicle driven in the shooting would likely have scrape marks from the curb on the undercarriage. A detective examined the vehicle and observed scrape marks under

the front quarter of the driver's side and rear bumper on the passenger side.

On May 25, 2007, Trooper McGrath asked a confidential police informant (informant), whose identity was not revealed in the affidavit, for information regarding the murder of Lima.[3] The informant stated that he had known Tavares for years, and correctly identified him in a photographic array. The informant told Trooper McGrath that he knew Tavares to carry a black .22 caliber pistol capable of holding eleven rounds of ammunition. The informant said Tavares had purchased the gun (which was stolen in New Hampshire) from Jose Santos two months prior to the May 21, 2007, shooting. The informant also related that some time in April, 2007, Tavares told the informant that he "shot off the whole clip" from the same gun at a man in an apartment on Exchange Street in Brockton. Tavares allegedly told the informant that he shot the man for stealing a gun from Santos, and even though Santos had forgiven the man, Tavares refused to "let it go." The informant also knew Santos to carry a .22 caliber gun. A man he knew as "Eddie," who the informant identified in a photograph array by selecting a picture of Ortega, was known to carry a .40 caliber pistol, and allegedly used the weapon when "he shot up Exchange St." following a 2006 murder.

The informant often acted informally as a "means of transportation" for Santos, Tavares, and Ortega. Earlier in the day of Lima's murder, the informant telephoned Tavares and asked if he needed a ride anywhere, and Tavares responded that he was driving "Shorty's rental," presumably meaning the vehicle rented by his former girl friend, Andrade. That night Santos was dining with the informant when he received a telephone call from Tavares requesting a meeting at the "M." The informant stated that "they," inferably meaning some group of individuals including Santos and Tavares, were renting a first-floor apartment on Market Street in Brockton, which they call the "M." The informant stated that the apartment's primary resident is a man named "Greg," which was corroborated by information known to the Brockton police that a Gregory Tobias resided there.

---

[3] Trooper McGrath attested in the affidavit that the informant has provided information in the past that had led to a Federal firearms conviction, and completed controlled purchases of "crack" cocaine orchestrated by police.

Santos and the informant arrived at the "M" shortly after midnight on the night of the shooting. When they arrived, Tavares and a man the informant knew only as "C" (whom he later identified as Hanson) were in the driveway of the "M." At the "M," Tavares and Santos retreated to a back room and had a discussion lasting approximately five minutes, to which the informant was not privy. Tavares later told the informant that Santos was angry because Tavares "did the dude."

The day after the shooting, May 22, Tavares telephoned the informant and advised him to "trust [me]" and "get rid" of his, the informant's, cellular telephone. Tavares told the informant that the police "snatched up 'D,' " presumably meaning his former girl friend, Andrade, and that she told the police Tavares's cellular telephone number. Tavares then asked the informant to meet him at an apartment on Newbury Street in Brockton, and at this meeting, he told the informant that abandoning the cellular telephones was necessary because of the "homeboy that I bodied last night." Tavares also told the informant, "We got bagged in the rental."

The following day, May 23, Tavares again telephoned the informant and said, "I see you don't listen, you still have your phone." Tavares needed to be picked up from the "M" in the informant's automobile. In the informant's vehicle, Tavares said that as long as "dude," inferably meaning Archer, the passenger in the red Nissan Altima, "isn't talking," Tavares would not get caught. According to the informant, Tavares further stated that he knew the police were examining the gray Chevrolet Malibu and that he's "caught a gun case before." He further told the informant that when he and Hanson were pulled over by State troopers the day after the shooting, they briefly evaded the troopers, and "threw the burner (gun) out the window." When police released Tavares and Hanson from custody, Tavares retrieved the gun, and stashed it at the "M."

In his conversations with police, the informant stated that he learned that the victim, Lima, was "Santos' boy," and that Tavares stated that he was friends with Lima too, and "didn't mean to [shoot] him."

On May 25, 2007, Tavares asked the informant to bring cigarettes and marijuana to Ortega, who was staying at a home in Fall River. That same day, the informant met Tavares in Fall

River, and Tavares showed him a .22 caliber Walther handgun. The informant said that Tavares and Ortega had been moving from apartment to apartment following the shooting in an attempt to remain undetected. As such, Trooper McGrath averred in his affidavit:

> "Paulo Tavares, Chris Hanson, Eddie Ortega or as yet any unknown co-conspirators are participating in an ongoing conspiracy relative to the crimes of murder, conspiracy to commit murder, accessory after the fact of murder, and intimidation of a witness, which are all crimes related to the murder of John Lima. . . . Further . . . that Paulo Tavares' and Eddie Ortega's oral communications will constitute material evidence . . . . Accordingly, I request that a search warrant be issued authorizing the secret interception of oral communications of Paulo Tavares and Eddie Ortega . . . ."

A District Court judge issued a general search warrant by signing McGrath's application for a general warrant pursuant to G. L. c. 276, §§ 1-7.[4] Ultimately, the informant wore a concealed recording device and intercepted at least two conversations where Tavares can be heard making inculpatory statements.

A Plymouth County grand jury indicted Tavares for murder, in violation of G. L. c. 265, § 1; armed assault with intent to murder, in violation of G. L. c. 265, § 18 (b); and unlawful possession of a firearm, in violation of G. L. c. 269, § 10 (a). Prior to trial, Tavares filed a motion to suppress the admission of statements made on the surreptitious audio recordings, which the Superior Court judge granted.

2. *The wiretap statute.* In 1968, the Legislature rewrote the wiretap statute, see G. L. c. 272, § 99, as appearing in St. 1968, c. 738, § 1, substantially overhauling a framework that had been in place since 1959. St. 1959, c. 449, § 1. The legislation had first been introduced in 1920. St. 1920, c. 558. See *Commonwealth* v. *Ennis*, 439 Mass. 64, 68 n.9 (2003); *Commonwealth* v. *Hyde*, 434 Mass. 594, 598-599 (2001). Alarmed by the commercial availability of sophisticated surveillance devices and the

---

[4]This warrant was neither properly applied for nor properly issued. See notes 7 and 8, *infra*.

ease with which they facilitated surreptitious recording of private citizens, the Legislature appointed a special commission in 1964 to investigate electronic eavesdropping and "ensure that unjustified and overly broad intrusions on rights of privacy are avoided." *Commonwealth* v. *Vitello*, 367 Mass. 224, 231 (1975). See *Commonwealth* v. *Hyde*, *supra* at 598; *Commonwealth* v. *Thorpe*, 384 Mass. 271, 280 n.7 (1981), cert. denied, 454 U.S. 1147 (1982); Report of the Special Commission on Electronic Eavesdropping, 1968 Senate Doc. No. 1132, at 7, 18-19. The Legislature ultimately adopted the special commission's recommendation to prohibit nonconsensual electronic surveillance by individuals and law enforcement officers. G. L. c. 272, § 99 C 1. *Commonwealth* v. *Thorpe*, *supra*. However, the Legislature also took pains to ensure that the bold new protections would not frustrate effective investigation and prosecution of "organized crime" enterprises, G. L. c. 272, § 99 A, which operated "through layers of insulation and behind a wall of secrecy." See *Commonwealth* v. *Thorpe*, *supra*. The statutory amendments were "carefully worded and unambiguous," *Commonwealth* v. *Hyde*, *supra* at 598, and included a preamble, G. L. c. 272, § 99 A, declaring the Legislature's twin objectives to (1) curtail "the uncontrolled development and unrestricted use of modern electronic surveillance devices," which the Legislature termed a danger "to the privacy of all citizens," and to (2) combat the "grave danger to the public welfare and safety" and "legitimate business activities" posed by "the increasing activities of organized crime."[5] See *Commonwealth* v. *Thorpe*, *supra* at 276-277. Thus, the "secret use of such [electronic surveillance] devices

---

[5]The Preamble to the wiretap statute, G. L. c. 272, § 99 A, in its entirety, reads: "The general court finds that organized crime exists within the commonwealth and that the increasing activities of organized crime constitute a grave danger to the public welfare and safety. Organized crime, as it exists in the commonwealth today, consists of a continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services. In supplying these goods and services organized crime commits unlawful acts and employs brutal and violent tactics. Organized crime is infiltrating legitimate business activities and depriving honest businessmen of the right to make a living.

"The general court further finds that because organized crime carries on its activities through layers of insulation and behind a wall of secrecy, government has been unsuccessful in curtailing and eliminating it. Normal investigative procedures are not effective in the investigation of illegal acts committed

by private individuals [was] prohibited," and the "use of such devices by law enforcement officials [was to] be conducted under strict judicial supervision and . . . *limited to the investigation of organized crime*" (emphasis supplied). G. L. c. 272, § 99 A. See *Commonwealth* v. *Long*, 454 Mass. 542, 553 (2009); *Commonwealth* v. *Thorpe, supra* at 280 n.7.

To that end, the wiretap statute is framed largely in negative terms: surreptitious "interception" of any "oral communication," by any person (private citizen or public official) is proscribed, except as specifically provided in a few narrow exceptions. G. L. c. 272, § 99 C 1. See *Commonwealth* v. *Hyde, supra* at 597; *Commonwealth* v. *Thorpe, supra* at 275. As defined by the statute, the term "interception" "means to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication."[6] G. L. c. 272, § 99 B 4. Of the exceptions to the proscription on interception of oral communications without the consent of all parties, two are of relevance in this case. First, "any person duly authorized" may obtain a judicially issued warrant by submitting an application in conformity with the requirements of the wiretap statute, G. L. c. 272, § 99 D 1 d, E, and F (warrant exception).[7] The second

by organized crime. Therefore, law enforcement officials must be permitted to use modern methods of electronic surveillance, under strict judicial supervision, when investigating these organized criminal activities.

"The general court further finds that the uncontrolled development and unrestricted use of modern electronic surveillance devices pose grave dangers to the privacy of all citizens of the commonwealth. Therefore, the secret use of such devices by private individuals must be prohibited. The use of such devices by law enforcement officials must be conducted under strict judicial supervision and should be limited to the investigation of organized crime."

[6]The amendments to the Massachusetts wiretap statute enacted in 1968 marked a significant departure from the framework of the earlier statute, and that of most States and the comparable Federal electronic surveillance statute, that generally permitted warrantless wiretapping with the consent of one party to the communication. *Commonwealth* v. *Hyde*, 434 Mass. 594, 599 & n.5 (2001), citing *Commonwealth* v. *Thorpe*, 384 Mass. 271, 280 n.7 (1981), cert. denied, 454 U.S. 1147 (1982). The 1968 amendments clearly "create a more restrictive electronic surveillance statute than comparable statutes in other States." *Commonwealth* v. *Hyde, supra* at 599, citing *Commonwealth* v. *Jackson*, 370 Mass. 502, 506 & n.6 (1976).

[7]A warrant obtained pursuant to G. L. c. 272, § 99 E, may issue only

exception is available when the party surreptitiously recording the oral communications is an investigative or law enforcement officer investigating a "designated offense," and that officer is either (1) a party to the communication or (2) has advance authorization from a party to the communication to intercept the conversation. G. L. c. 272, § 99 B 4 (one-party consent exception). See *Commonwealth* v. *Thorpe, supra* at 275-276.

The common qualifying predicate for both of these exceptions is the existence of an investigation concerning a "designated offense." G. L. c. 272, § 99 B 4 and E 2. That is, one of several specifically enumerated crimes, including murder, when the offenses are committed "in connection with organized crime as defined in the preamble." G. L. c. 272, § 99 B 7. The preamble specifically defines "organized crime" to mean "a continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services." G. L. c. 272, § 99 A. Reading the plain language of the preamble's definition of "organized crime," in concert with the clear legislative intent substantially to limit the availability of wiretapping in criminal investigations, we have stated that the one-party consent exception is "a narrow exception to the broad statutory prohibition against warrantless surveillance." *Commonwealth* v. *Thorpe, supra* at 279 ("Legislature proceeded on the premise that electronic surveillance is anathema except within certain narrowly prescribed boundaries").

In this case, to admit in evidence the surreptitiously recorded communications between Tavares and a confidential informant

"[u]pon a sworn application in conformity with this section; and . . . [u]pon a showing by the applicant that normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried." Under G. L. c. 272, § 99 F, a warrant may only issue, if among several other conditions, (1) the applicant is a specially designated assistant attorney general or assistant district attorney in the Commonwealth; (2) the application contains a "statement of facts establishing probable cause to believe that a particularly described designated offense has been, is being, or is about to be committed" and a "particular description of the nature of the oral or wire communications sought to be overheard"; (3) "the oral or wire communications of the particularly described person or persons will occur in a particularly described place and premises or over particularly described telephone or telegraph lines"; and (4) "the oral or wire communications sought are material to a particularly described investigation or prosecution and that such conversations are not legally privileged." See *Commonwealth* v. *Vitello,* 367 Mass. 224, 231-233 (1975).

working with State police investigators, the Commonwealth must meet the criteria imposed by either the warrant exception or the one-party consent exception. See *Commonwealth* v. *Thorpe, supra* at 276; *Commonwealth* v. *Vitello*, 367 Mass. 224, 231-233 (1975). The Commonwealth concedes, as it must, that the warrant exception does not apply.[8]

Thus, the sole issue for review is whether the Commonwealth, through Trooper McGrath's affidavit, demonstrated that the interception of Tavares's oral communications would disclose evidence of the commission of a designated offense in connection with "a continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services," as required by the one-party exception.

3. *Discussion.* The Commonwealth argues that the information set forth in Trooper McGrath's affidavit establishes a nexus between the drive-by killing of Lima and the pursuits of an organized crime enterprise in which Tavares participated as a principal. Thus, the Commonwealth contends, the one-party consent communications, involving Tavares and recorded surreptitiously by a police informant, do not violate the wiretap statute's prohibition on "secret transmission or recording of oral communications without the consent of all parties." *Commonwealth* v. *Blood*, 400 Mass. 61, 66 (1987), citing G. L. c. 272, § 99 B 4 and C 1.

Specifically, the Commonwealth argues that Trooper McGrath's affidavit presents evidence that Tavares, Ortega, and Hanson deliberately targeted either Lima or Archer, or both, in a carefully coordinated execution. It points to the fact that the men identified the red Nissan Altima just minutes after Lima's

---

[8]Prior to equipping the informant with a recording device to surreptitiously intercept conversations with Tavares and others, Trooper McGrath submitted an application seeking a general search warrant pursuant to G. L. c. 276, §§ 1-7, and supported the application with an accompanying affidavit. However, applications for wiretapping warrants must be filed under § 99 E of the wiretap statute, and must comport with the rigorous and sui generis requirements of § 99 F. See note 7, *supra.* Similarly, a judge may only issue a wiretapping warrant "[u]pon a sworn application in conformity with" the wiretap statute, and not as a general search warrant. See G. L. c. 272, § 99 E 1. Although a District Court judge granted Trooper McGrath's application for a warrant, the application did not comply with many of the requirements set forth in § 99 F, and the warrant exception is unavailable. See G. L. c. 272, § 99 E and F.

sister lent him the vehicle, suggesting surveillance and pre-meditation. It also points to evidence of discipline and organiza-tion in renting and meeting at the "M," a central locus known to all of them. Further, the Commonwealth argues that the de-scriptions of Tavares's interactions with Santos suggest the group's hierarchical structure, with Santos occupying an unspeci-fied position of supervisory authority. Tavares spoke with San-tos immediately following the killing of Lima, and Tavares related to the informant that Santos was upset that Tavares "did the dude," presumably referring to Lima. Last, the group proved adept at conspiring to cover up the killing by evading police, concealing the murder weapon at the "M," and retreating to several locations outside of Brockton to remain "undetected."

The Commonwealth also stresses that Tavares, Santos, and Ortega were all known to carry guns and commit violent crimes relating to ownership of those guns. Tavares had purchased a .22 caliber gun, which he was known to carry, from Santos. Santos previously owned a different .22 caliber gun. Ortega was reputed to carry a .40 caliber gun, and reportedly used the weapon when "he shot up Exchange St." in 2006. Tavares told the informant, despite Santos's admonition to "let it go," that he murdered another man in the past for stealing a gun owned by Santos. The Commonwealth argues that this constellation of facts gives rise to a reasonable suspicion that the commission of the crimes described in the affidavit was part of "an effort to protect both the business and its organization." While the affi-davit "lacked a clear picture of the players involved" in killing Lima, the Commonwealth contends that the affidavit presented sufficient facts to prove that the "nature of the crime involved here lends itself to inferences of discipline and organization." *Commonwealth* v. *Lykus*, 406 Mass. 135, 142 & n.10 (1989).

In determining whether a nexus with organized crime exists, the Commonwealth must satisfy the burden of demonstrating that its "decision to intercept was made on the basis of a reason-able suspicion that interception would disclose or lead to evi-dence of a designated offense in connection with organized crime." *Commonwealth* v. *Thorpe*, 380 Mass. 271, 281 (1981), cert. denied, 454 U.S. 1147 (1982). "The standard of reasonable suspicion is an objective one; it is met by a showing of articul-able facts from which a reasonable person could conclude that

interception would lead to evidence of a designated offense."
*Id.* See *Commonwealth* v. *Long,* 454 Mass. 542, 556 (2009);
*Commonwealth* v. *D'Amour,* 428 Mass. 725, 737 (1999). Murder
is an enumerated "designated offense" under G. L. c. 272,
§ 99 B 7, so the only showing required from the Commonwealth
is that Tavares's participation in Lima's murder occurred in
connection with "organized crime," as defined in the wiretap
statute's preamble.[9] *Commonwealth* v. *Long, supra.*

"The definition of organized crime as 'a *continuing* conspiracy
among highly organized and disciplined groups to engage in
*supplying illegal goods and services'* . . . conceives of organ-
ized crime as a continuing criminal operation usually, but not
necessarily, for pecuniary ends" (emphasis in original). *Id.* See
G. L. c. 272, § 99 A. To that end, we have said that to satisfy
the wiretap statute's definition of organized crime, the Com-
monwealth must offer "some evidence of an ongoing illegal
business operation." *Commonwealth* v. *Long, supra,* citing *Com-
monwealth* v. *Thorpe, supra* at 277 n.6 (noting that statutory
definitions of organized crime in other jurisdictions focus on
elements of organization, discipline, and provision of illegal
goods and services).

In addition to the supply of illegal goods and services, the
other signature of "organized crime" activity is discipline. See
G. L. c. 272, § 99 A; *Commonwealth* v. *D'Amour, supra* at 737.
The "distinction between more 'garden-variety' criminal activ-
ity, where wiretapping is impermissible," and "organized
crime," as defined by the wiretap statute, is the "high degree
of discipline and organization" required to plan and coordinate
the latter. *Id.* Moreover, "[w]hile 'the class of people subject
to wiretaps includes more than full-time professional crim-
inals,' *Commonwealth* v. *D'Amour, supra* at 737, quoting *Com-*

---

[9]General Laws c. 272, § 99 B 7, provides that the "term 'designated of-
fense' shall include the following offenses in connection with organized crime
as defined in the preamble: arson, assault and battery with a dangerous weapon,
extortion, bribery, burglary, embezzlement, forgery, gaming in violation of
[G. L. c. 271, § 17], intimidation of a witness or juror, kidnapping, larceny,
lending of money or things of value in violation of the general laws, mayhem,
murder, any offense involving the possession or sale of a narcotic or harmful
drug, perjury, prostitution, robbery, subornation of perjury, any violation of
this section, being an accessory to any of the foregoing offenses and conspiracy
or attempt or solicitation to commit any of the foregoing offenses."

*monwealth* v. *Thorpe, supra* at 277 n.6, coordination of efforts among cohorts standing alone is insufficient." *Commonwealth* v. *Long, supra* at 557. "For a conspiracy to commit an offense enumerated in G. L. c. 272, § 99 B 7, to rise to the level of organized crime, there must, at the very least, be an organized plan from which one reasonably may infer the existence of an ongoing criminal operation." *Id.*, and cases cited.

While the facts adduced in Trooper McGrath's affidavit evince some measure of organization, the dispositive factor is that the affidavit singularly fails to establish any evidence that the fraternization of Tavares, Ortega, Hanson, and Santos promoted the supply of "illegal goods and services" or the furtherance of an "ongoing illegal *business* operation" as the controlling definition of organized crime requires (emphasis supplied). G. L. c. 272, § 99 A. See *Commonwealth* v *Long, supra* at 556, citing *Commonwealth* v. *Thorpe, supra* at 277 n.6. While the evidence that the group convened at the "M," that they possessed guns, and that some members may have committed retributive killings in the past provides glimmers of the existence of a putative street gang, there is no information beyond speculation that Tavares or any other party was involved in a pecuniary enterprise, such as drug, gun, or contraband trafficking, or promoted some other unifying criminal purpose. Unlike the kidnapping for ransom in *Commonwealth* v. *Lykus, supra*, or the murder plot to collect insurance proceeds in *Commonwealth* v. *D'Amour, supra*, no motive or plot is even alluded to in the affidavit. As in *Commonwealth* v. *Long, supra* at 557, the evidence of meetings and plans to conceal the killing of Lima, without more, demonstrates only "coordination of efforts among cohorts," which we said, "standing alone is insufficient" to prove a nexus with organized crime.

Although the affidavit avers that Santos sold Tavares a .22 caliber gun, this exchange amounted to a single isolated transaction, not evidence of the type of "ongoing, multi-transactional criminal enterprise" that is required to meet the wiretap statute's narrow definition of organized crime, G. L. c. 272, § 99 A and B 7. *Commonwealth* v. *Long, supra* at 558. Moreover, even if illegal gun possession formed the basis of what the Commonwealth strains to paint as a "highly organized and disciplined"

criminal enterprise, there is not a scintilla of evidence in the affidavit that the designated offense (the murder of Lima) was committed "in connection" with that organized criminal trade as required to qualify for the one-party consent exception. See *Commonwealth* v. *Long, supra.* By the alleged murderer's own account, the killing of Lima was an accident. Tavares told the informant that Lima was "Santos' boy," and Tavares was friends with the victim too, and "didn't mean to hit him [with gunfire]." If Archer, the passenger in the car Lima was driving, was the intended target, or there was some other motive linked to protecting or advancing the supply of "illegal goods and services," as required by the one-party consent exception, the affidavit is problematically silent in that respect. See *id.*

In addition to omitting evidence of a pecuniary or illegal business purpose, the affidavit contains information indicating that the group, as a unit, did not demonstrate "other hallmarks of organized crime — discipline, organization, and a continuing nature." *Id.* Although the affidavit contains indicia of Santos's status as the putative leader of this group, there is other evidence that he lacked authority. As discussed, Tavares shot and killed Lima, even though Lima was a known friend of Santos and was not the target of the drive-by shooting. Moreover, in the past, Tavares killed another man who allegedly stole a gun from Santos, despite Santos's pleas to "let it go." These facts suggest a continuing roguish or free-agent quality to Tavares's allegedly violent impulses, rather than an organized criminal enterprise.

In sum, while street gangs that coordinate to commit violent acts may otherwise qualify as organized criminal entities, a member of a group or gang, like any other citizen of the Commonwealth, may not be surreptitiously wiretapped unless law enforcement meets its burden of demonstrating an objectively reasonable suspicion that the group has committed a designated offense in pursuit of organized efforts to supply illicit goods or services. G. L. c. 272, § 99 A, B 4, and C 1. In contrast to the Federal wiretap statute and the statutes of many other States, the Massachusetts wiretap statute conscientiously labors to afford only a narrow window of exception to its prohibition of warrantless wiretapping. G. L. c. 272, § 99 B 4. Having failed in the affidavit to establish a nexus between the drive-by killing of Lima and organized crime, as defined in the wiretap statute,

the Commonwealth, in turn, failed to meet the rigors of that narrow exception. See G. L. c. 272, § 99 A and B 4; *Commonwealth* v. *Long, supra* at 556-558; *Commonwealth* v. *Thorpe, supra* at 279-281. Therefore, we decline to disturb the ruling of the judge allowing Tavares's motion in limine to suppress the admission of statements made by him, and secretly recorded by the informant.

> *Order allowing defendant's motion to suppress affirmed.*

GANTS, J. (concurring, with whom Cowin, J., joins). I agree with the court that an electronic interception of oral communications under G. L. c. 272, § 99, is permitted only where there is probable cause to believe the intercepted oral communications will provide evidence of a "designated offense," which is defined as one of the listed offenses "in connection with organized crime." G. L. c. 272, § 99 B 7 and F 2 b. I also agree with the court that "organized crime," as defined in the preamble, "consists of a continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services." G. L. c. 272, § 99 A. Finally, I agree with the court's conclusion that the information in the electronic surveillance affidavit, while it provided probable cause to believe that the defendant had committed a murder and that the requested oral interceptions would provide evidence of the defendant's participation in the murder, did not provide the required reasonable suspicion that the murder was "in connection with organized crime," so the allowance of the defendant's motion to suppress must be affirmed. I write separately because I believe that "attention must be paid"[1] to the consequences of the statutory language in § 99 that permits electronic surveillance only to obtain evidence of a designated offense "in connection with organized crime."

By limiting electronic surveillance to designated offenses "in connection with organized crime," § 99 prohibits electronic surveillance from being used to investigate designated offenses,

[1]A. Miller, Death of a Salesman, The Portable Arthur Miller 19, 60 (1995).

including murder, that are committed by disorganized criminal gangs or even by organized street gangs that do not engage in supplying illegal goods and services, such as narcotics. The consequence is that electronic surveillance is lost as a tool to investigate and prosecute a substantial share of the murders and shootings that occur in this Commonwealth — those committed by street gangs. "Between 1999 and 2006, the number of gang-related youth homicides [in Boston] had increased six-fold." Braga, Losing Faith? Police, Black Churches, and the Resurgence of Youth Violence in Boston, 6 Ohio St. J. Crim. L. 141, 153 (2008). "In contrast to large and semi-organized gangs in Chicago and Los Angeles, Boston gangs were (and are) mostly small, informal, and loosely organized groups of youth," usually associated with a "specific street, neighborhood, or housing project." *Id.* at 154. Perhaps as a consequence, a "majority of Boston youth homicides identified as gang-related were not about drugs, money, turf, or other issues in which the violence could be reasonably construed to be instrumental. They were usually personal and vendetta-like." *Id.* at 153 n.40.[2] See Kennedy, Youth Violence in Boston: Gun Markets, Serious Youth Offenders, and a Use-Reduction Strategy, 59 L. & Contemp. Probs. 147, 153 (1996) ("urban environment has become so threatening even for youth not involved in the drug trade that many are arming themselves [and engaging in other nominally self-protective behavior such as joining gangs] for self-defense").

The loss of electronic surveillance (which includes not only "bugging" a room or a telephone but also the consensual "wearing of a wire" by a cooperating witness, as occurred in the instant case) as an investigative tool in gang shootings is even more troubling when one considers that these violent crimes are among the most difficult to solve because the witnesses to these

---

[2] "Gang-related motives accounted for 76.9% of the 39 youth homicides in 2006. Boston gang members were also involved as either the perpetrator or victim in 70% of the shootings in 2006." Braga, Losing Faith? Police, Black Churches, and the Resurgence of Youth Violence in Boston, 6 Ohio St. J. Crim. L. 141, 153 (2008). Other studies have "found gang-related motives in more than one third of homicides in Chicago, fifty per cent of the homicides in Los Angeles' Boyle Heights area, and seventy per cent of the homicides in Lowell, Massachusetts." *Id.* at 153 n.38.

crimes are so reluctant to come forward to provide information and testimony for fear of violence, retaliation, and social ostracism. At a 2004 legislative hearing, the district attorney for Suffolk County estimated that "issues of intimidation," described as victims or witnesses refusing to cooperate or changing or recanting earlier testimony, occurred in up to ninety per cent of his office's cases involving guns, gangs, or serious violence. There is no reason to believe that this percentage has fallen since then, or that other urban areas in the Commonwealth do not face comparable problems obtaining the cooperation of victims and witnesses in street gang shootings. See generally Woldoff, Stop Snitchin': Exploring Definitions of The Snitch and Implications for Urban Black Communities, 17 J. Crim. Just. & Popular Culture 184 (2010).

In short, the legislative inclusion of five words, "in connection with organized crime," means that electronic surveillance is unavailable to investigate and prosecute the hundreds of shootings and killings committed by street gangs in Massachusetts, which are among the most difficult crimes to solve and prosecute using more traditional means of investigation. If the Legislature wishes to avoid this result, it should amend § 99 to delete those words.