Commonwealth *vs.* Marcus Mitchell.

Bristol. February 3, 2014. - June 18, 2014.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.

*Eavesdropping. Evidence,* Wiretap. *Search and Seizure,* Electronic surveillance, Warrant. *Practice, Criminal,* Interlocutory appeal, Motion to suppress, Warrant.

A Superior Court judge erred in allowing a criminal defendant's pretrial motion to suppress a recorded conversation between a cooperating witness and the defendant, where the conversation was not an interception and did not require a warrant under G. L. c. 272, § 99 F, given that the recording was made in the course of an investigation of a designated offense (i.e., murder) under G. L. c. 272, § 99 B 7, in that law enforcement officers, acting in good faith, instructed the cooperating witness to attempt to elicit information regarding the murder (regardless of whether the cooperating witness shared the officers' intention to investigate the murder or ultimately may have thwarted their intention) [421-425]; and where the evidence was sufficient for the judge to conclude that there was a reasonable suspicion that the murder that was the subject of the investigation was committed in connection with organized crime [425-428].

Indictments found and returned in the Superior Court Department on May 6, 2011.

A pretrial motion to suppress evidence was heard by *Thomas F. McGuire, Jr.,* J.

An application for leave to file an interlocutory appeal was allowed by *Spina,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him.

*David B. Mark,* Assistant District Attorney, for the Commonwealth.

*Richard B. Klibaner* for the defendant.

Gants, J. Under the Massachusetts electronic surveillance statute, G. L. c. 272, § 99 F, the Commonwealth is required to obtain a warrant before it may conduct an "interception," which is defined as the secret recording or transmitting of the contents of any wire or oral communication without the consent of *all*

parties to the communication. G. L. c. 272, § 99 B 4. However, under the "one-party consent exception," set forth in § 99 B 4, "it shall not constitute an interception for an investigative or law enforcement officer . . . to record or transmit a wire or oral communication if the officer is a party to such communication or has been given prior authorization to record or transmit the communication by such a party and if recorded or transmitted in the course of an investigation of a designated offense as defined [under G. L. c. 272, § 99 B 7]." The primary issue presented on appeal is the scope of the one-party consent exception, that is, whether a telephone call recorded by the police between the defendant and a cooperating witness is an "interception" requiring a warrant under § 99 F, where the cooperating witness, despite being instructed by a law enforcement officer to elicit information regarding a "designated offense," instead elicits information only about a subsequent unrelated crime that is not a "designated offense." A Superior Court judge concluded that the recording was not made "in the course of an investigation of a designated offense" and therefore allowed the defendant's motion to suppress the recording, because the cooperating witness did not attempt to discuss the "designated offense" during the recorded telephone call. We reverse the allowance of the motion because we conclude that where a law enforcement officer, acting in good faith, instructs a cooperating witness to attempt to elicit information regarding a "designated offense," the recorded conversation is not an "interception" — and therefore does not require a warrant under § 99 F — regardless of whether the cooperating witness actually follows the officer's instructions and attempts to elicit information during the conversation about a "designated offense."

*Background.* We summarize the facts as found by the judge who decided the motion to suppress, supplementing those findings with evidence in the record that is uncontroverted and that was implicitly credited by the judge. See *Commonwealth* v. *Isaiah I.*, 448 Mass. 334, 337 (2007), *S.C.*, 450 Mass. 818 (2008).

The defendant and several others, including Thomas Jeffries, were involved in a drug distribution enterprise in Taunton known as "Team Supreme." In early 2009, various members of Team

Supreme were engaged in a feud of unspecified origin with Francisco Monteiro. The defendant told Jeffries that Monteiro was looking for the defendant, and Jeffries gave the defendant a firearm for his protection. When Jeffries subsequently met with Monteiro, perhaps in an effort to resolve the feud, Monteiro assaulted Jeffries and took his automobile keys. On April 24, 2009, the cooperating witness, who was a member of "Team Supreme," was shot outside a bar; Monteiro was suspected of having committed the shooting.

On the night of May 16 or in the early morning hours of May 17, after learning that Monteiro had been seen at a bar, Jeffries, the defendant, and two others drove to the bar in two vehicles to retaliate against Monteiro. When the group arrived at the bar, they saw Monteiro leave in a vehicle with Troy Pina and two others. They followed Monteiro's vehicle, approached it on the highway, and, using at least three firearms, fired at the vehicle. Pina was struck by one of the bullets and died shortly thereafter.

On July 14, 2010, the cooperating witness was arrested for the unlawful possession of a firearm found in a vehicle he was driving. The defendant had been a passenger in the vehicle but fled before the police stopped the vehicle. When the cooperating witness was in custody, unable to post bail, he agreed to cooperate in the investigation of Pina's killing and, as part of his cooperation, agreed to record telephone calls with the defendant and others. As a result of his cooperation, the cooperating witness was released from custody while awaiting trial on the firearms charge.

The Commonwealth did not seek a warrant to conduct an "interception" under § 99 F but, on January 14, 2011, obtained a warrant from a judge of the Superior Court approving the recording of face-to-face and telephone conversations by the cooperating witness with the defendant pursuant to *Commonwealth* v. *Blood*, 400 Mass. 61 (1987) (warrant required under art. 14 of Massachusetts Declaration of Rights for secret recording of oral communication in private home regardless of whether one party consents to recording).[1]

On January 21, State police Trooper Daniel Giossi and Taun-

---

[1] Although part of the background of this case, the warrant obtained pursuant to *Commonwealth* v. *Blood*, 400 Mass. 61 (1987), does not affect the

ton police Detective Peter Korr instructed the cooperating witness to speak with the defendant in a recorded telephone call about Pina's killing, and to elicit information regarding the guns that had been used and the other persons who were involved. The cooperating witness told the officers that, because the defendant knew that he had been arrested on the firearms charge and had been held in custody on that charge, the firearms arrest would be an "expected" subject of discussion between the two in their first long conversation following his arrest, and it would arouse the defendant's suspicion if he failed to mention the firearms case and instead started asking questions about Pina's killing. He also told the officers that he wanted the defendant to "corroborate his story" that the firearm belonged to the defendant and that the defendant had left it in the automobile when he fled. The officers told him to do "whatever he had to do to get conversation" about the murder.

In the presence of the officers, the cooperating witness telephoned the defendant and immediately admonished the defendant for leaving the firearm in the vehicle that the cooperating witness had been driving, telling the defendant that he was "on the verge of losing . . . everything" he had because the defendant ran without taking the firearm with him. The defendant admitted on several occasions that the firearm was his and apologized to the cooperating witness for leaving it in the vehicle when he fled. The cooperating witness asked the defendant if there were any "bodies on that gun," and the defendant said that he did not know. Eventually, "[t]he conversation became heated," and the cooperating witness ended the telephone call without discussing Pina's killing.

On May 6, 2011, the defendant was indicted for the murder of Pina and for several other offenses related to the May, 2009, shooting,[2] as well as for the unlawful possession of a firearm on

lawfulness of the recorded telephone conversation at issue here because it did not occur in the defendant's home. If the recorded telephone call were an "interception" under G. L. c. 272, § 99 B 4, that required a warrant, the Commonwealth concedes that the warrant issued here did not meet the more stringent requirements of G. L. c. 272, § 99, to authorize electronic surveillance.

[2]The other indictments returned included one charging unlawful possession of a firearm, three charging armed assault with intent to murder, and three charging assault with a dangerous weapon.

July 14, 2010. The defendant moved to suppress the recorded telephone conversation.[3] After an evidentiary hearing, the judge allowed the motion. The judge found that the police officers had "specifically instructed" the cooperating witness to ask about the murder but that the cooperating witness "hijacked the conversation for his own purposes," which was "to obtain evidence exculpating himself" in the unrelated firearms case. The judge found that, "[w]hatever the police may have expected, the call was not, in fact, an attempt to gain information about the murder," and concluded that the recording of the call "was not 'in the course of' the murder investigation as required to dispense with the need for a warrant."[4] The judge made clear that a finding under § 99 B 4 that a recorded telephone call was made in the course of an investigation of a designated offense "does not require the investigators to be successful in eliciting incriminating statements about the designated offense," but does require an "attempt to do so" in the conversation.[5]

The Commonwealth sought leave from a single justice of this court to file an interlocutory appeal. See Mass. R. Crim. P. 15 (a) (2), as appearing in 422 Mass. 1501 (1996). The single justice granted leave and reported the interlocutory appeal to the full court.

*Discussion.* "In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004), quoting *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002).

The defendant does not contend that the recording of the telephone call violated the Fourth Amendment to the United States

---

[3]The indictment charging illegal possession of a firearm on July 14, 2010, had been severed from the other indictments before the motion to suppress was filed, but there is no dispute that the motion applies to all the indictments.

[4]The judge found that the murder of Pina was a "designated offense" under G. L. c. 272, § 99 B 7, because there was reasonable suspicion that his murder was committed in connection with organized crime.

[5]The Commonwealth moved for reconsideration based on revisions to the transcript of the recorded conversation. The judge amended his memorandum of decision and order to incorporate the transcript revisions in his statement of facts and to address the revisions in his analysis of the law, but again denied the motion.

Constitution.[6] Nor, where the recording was not made inside the defendant's home, does the defendant contend that the recording violated art. 14 of the Massachusetts Declaration of Rights.[7] Rather, the defendant contends that the recorded telephone call was an "interception" under G. L. c. 272, § 99 B 4,[8] that may be conducted only with an electronic surveillance warrant under G. L. c. 272, § 99 F, because it was not recorded "in the course of an investigation of a designated offense" and therefore falls outside the one-party consent exception where the cooperating witness did not attempt to elicit information about the murder but attempted only to elicit information about the subsequent firearms offense.

Under the one-party consent exception in § 99 B 4, a secret recording of a conversation is not an "interception" and is therefore lawfully recorded without a warrant where (1) at least one party to the conversation gives prior consent to the recording of the conversation; (2) the party giving consent is a law enforcement officer or a person who has authorized a law enforcement officer to record the conversation; (3) the recording is made "in the course of an investigation" of at least one of the designated offenses listed in § 99 B 7; and (4) the designated offense is "in connection with organized crime as defined in the preamble" in G. L. c. 272, § 99 A. G. L. c. 272, § 99 B 4, B 7. Here, there is no dispute that the cooperating witness was a party to the telephone conversation and consented to its re-

---

[6]"[W]arrantless surveillance with 'one party consent' has been held to lie beyond the protective reach of the Fourth Amendment to the United States Constitution." *Blood*, 400 Mass. at 67, citing *United States* v. *Caceres*, 440 U.S. 741, 750-751 (1979).

[7]Where an in-person, private conversation is recorded or transmitted in a home with the consent of only one party, a warrant is required under art. 14 of the Massachusetts Declaration of Rights. See *Blood*, 400 Mass. at 77.

[8]General Laws c. 272, § 99 B 4, provides: "The term 'interception' means to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication; provided that it shall not constitute an interception for an investigative or law enforcement officer, as defined in this section, to record or transmit a wire or oral communication if the officer is a party to such communication or has been given prior authorization to record or transmit the communication by such a party and if recorded or transmitted in the course of an investigation of a designated offense as defined herein."

cording by law enforcement. Nor is there any dispute that murder is one of the designated offenses listed in § 99 B 7, and that the illegal possession of a firearm is not. Nor is there any challenge to the judge's finding that the law enforcement officers caused the cooperating witness to make the recorded telephone call for the purpose of eliciting information about the victim's killing and so instructed him before the telephone call was initiated. The judge, however, found that the cooperating witness did not share this purpose but, instead, sought only to elicit information about the subsequent firearms offense.

1. *"In the course of an investigation" of murder.* The crux of the dispute is whether a recorded telephone call is made "in the course of an investigation" of murder where the law enforcement officers in good faith instructed the cooperating witness to attempt to elicit information about a murder but the witness instead elicited information only about a firearms offense. We conclude that it is.

A criminal investigation is conducted by law enforcement officers, so their investigative purpose, not the purpose of a person cooperating in the investigation, determines whether a call is made "in the course of an investigation." See G. L. c. 272, § 99 B 8 ("investigative or law enforcement officer" defined as officer "empowered by law to conduct investigations of, or to make arrests for, the designated offenses"). Therefore, where law enforcement officers are actively investigating a murder and instruct a cooperating witness to elicit information about that murder in a recorded telephone call, the call is "in the course of an investigation" of murder, provided the instructions were made in good faith, regardless of whether the cooperating witness shared the officers' intention to investigate the murder or ultimately thwarted their intention.

Such instructions are in good faith where the officers' instructions reflect their actual intent, and are not, through some variant of a wink and a nod, contrary to the officers' true intent regarding the investigative purpose of the recorded call. Here, the judge effectively found that the officers' true investigative purpose in causing the cooperating witness to make the recorded telephone call was to obtain information about the murder, and this finding was not clearly erroneous. That the cooperating

witness told the officers before initiating the call that he intended to discuss the firearms offense does not require the inference that the officers intended or even knew the call would elicit information only about that offense. The cooperating witness made a persuasive argument that the defendant would expect him first to discuss the pending firearms case and that opening the conversation with discussion of a twenty month old shooting would potentially blow his cover. It was not unreasonable under these circumstances to allow the cooperating witness to "do whatever he needed to do" to cause the defendant to discuss the murder.

The content of the call does not suggest the officers acted in bad faith. The officers reasonably could not direct the cooperating witness regarding the subject matter of the conversation after it began, nor anticipate when it would end. At the motion hearing, Trooper Giossi testified that police officers do not want to "give away that [they are] there" by giving the cooperating witness directions during the conversation. Instead, they "let the conversation flow" by enabling the cooperating witness to "enter the conversation in his style." Doing otherwise might make the target of the recorded conversation suspicious of the cooperating witness, thereby jeopardizing the witness's safety as well as the success of the investigation, particularly where the one-party consent exception is limited to the investigation of crimes connected to organized crime. G. L. c. 272, § 99 A, B 7. Although the cooperating witness had a strong incentive to elicit from the defendant a confession to the firearms offense for which the cooperating witness had been charged, there is no evidence that the officers viewed that proposed line of questioning as anything other than a means to engage the defendant in conversation related to the murder. Moreover, the officers had reason to believe the cooperating witness would comply with their instructions to attempt to discuss the murder. The cooperating witness had been helping the police with the murder investigation for several months at the time of the call and had proved to be reliable. In addition to providing the officers with information related to the murder, including the names of some of those involved and the whereabouts of one of the firearms used, the cooperating witness had engaged another Team Supreme member

in numerous recorded conversations concerning the murder investigation, as well as a plot to kill a witness.[9]

2. *Nexus to organized crime.* Because we conclude that the recording was made in the course of the investigation into the murder, we now consider the defendant's second argument: that the police lacked reasonable suspicion that Pina's murder was committed "in connection with organized crime," as required by G. L. c. 272, § 99 B 7. "In determining whether a nexus with organized crime exists, the Commonwealth must satisfy the burden of demonstrating that its 'decision to intercept was made on the basis of a reasonable suspicion that interception would disclose or lead to evidence of a designated offense in connection with organized crime.' " *Commonwealth* v. *Tavares,* 459 Mass. 289, 299 (2011), quoting *Commonwealth* v. *Thorpe,* 384 Mass. 271, 281 (1981), cert. denied, 454 U.S. 1147 (1982). "Organized crime," as defined in the preamble at § 99 A, "consists of a continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services." "In supplying these goods and services organized crime commits unlawful acts and employs brutal and violent tactics." *Id.* To satisfy this definition of "organized crime," "the Commonwealth must offer 'some evidence of an ongoing illegal business operation.' " *Tavares, supra* at 300, quoting *Commonwealth* v. *Long,* 454 Mass. 542, 556 (2009).

We have recently decided two cases that are useful in deciding this case. In *Tavares, supra* at 298-299, the Commonwealth argued that there was sufficient evidence to demonstrate that a drive-by shooting in which a victim was killed was committed in connection with organized crime for the purpose of G. L. c. 272, § 99 B 4 and B 7, where there was some evidence that the suspects met at a central location and coordinated the shooting, were part of a group that had some degree of hierarchical structure, "proved adept" at covering up the murder and "evading police," and often carried guns and committed violent crimes.

---

[9]Because we conclude that the judge erred in allowing the motion to suppress based on the facts he found, we need not consider whether the judge's finding that the cooperating witness "never attempted to elicit any information about the murder of Troy Pina" was clearly erroneous in light of the cooperating witness's question whether there were any "bodies" on the firearm the defendant left in the automobile.

We held that there was not reasonable suspicion that the shooting was in connection with organized crime for three reasons. First, although the Commonwealth's evidence demonstrated "some measure of organization," which provided "glimmers of the existence of a putative street gang," we determined that there was no evidence that the gang members promoted the supply of illegal goods or services, or furthered an ongoing illegal business operation. *Id.* at 301. Second, the evidence did not show that the street gang members demonstrated "other hallmarks of organized crime — discipline, organization, and a continuing nature." *Id.* at 302, quoting *Long*, *supra* at 558. Third, there was "not a scintilla of evidence" that the murder in that case was committed in connection with an organized criminal activity. *Id.* "By the alleged murderer's own account, the killing of [the victim] was an accident." *Id.*

In *Commonwealth* v. *Hearns*, 467 Mass. 707, 715 (2014), by contrast, we held that the one-party consent exception applied where the investigating officer's affidavit, "although conclusory in part, provided an adequate basis" to support the motion judge's conclusion that a shooting had been committed in connection with organized crime. Specifically, the affidavit asserted that the defendant was a member of a group known as "H-Block"; that the group's senior members orchestrated the sale of drugs, distribution of firearms, and carrying out of violent "missions" by more junior members; and that H-Block was engaged in an "ongoing 'feud' " with other drug distribution organizations. *Id.* at 711, 716. Based on the evidence available to the officers at the time the relevant communication was recorded, we held that it was reasonable to infer that "the shooting at issue was intended as an act of intimidation directed at [a rival gang] and related to its competing illegal enterprises." *Id.* at 716.

The evidence in this case is more similar to that in *Hearns* than that in *Tavares*. There was corroborated evidence here that Team Supreme was a "drug distribution enterprise." The defendant had been arrested, along with Jeffries and others, on August 23, 2010, "in connection with a drug enterprise operating in the city of Taunton." A cooperating witness (who is different from the witness who recorded the conversation at issue on appeal)

confirmed that Jeffries was a drug dealer and that the defendant was one of his associates. Finally, the week before the cooperating witness recorded his conversation with the defendant, Jeffries's former girl friend contacted the cooperating witness to "set up a purchase of narcotics."

In contrast with *Tavares, supra* at 302, where the defendant appeared to have acted alone, at least four members of Team Supreme actively participated in the killing; several more helped cover it up, including by hiding a gun that was used in the shooting and by conspiring to kill a potential witness. Although, as in *Hearns, supra* at 716, there is no evidence here regarding the origins of the dispute between Monteiro's group and Team Supreme, it is clear the two groups were engaged in a bitter and violent feud. Based on the evidence, it can be inferred that Monteiro and his associates posed at least a physical, and possibly economic, threat to Team Supreme's members and interests, and that the feud between the groups was more than personal. Even if the feud were purely personal, an illegal drug distribution business may see the perception of weakness as potentially fatal to an enterprise that wishes to protect its turf against competitors. In the perverse world of a street drug organization, violence in response to perceived threats is often viewed as necessary to maintain its customer base, to intimidate or weaken rivals, to protect its reputation, and to deter future threats from emerging. See Fagan & Wilkinson, Guns, Youth Violence, and Social Identity in Inner Cities, 24 Crime & Just. 105, 164 (1998) ("Gun carrying and use are central features to the drug business. . . . Violence in drug dealing can be viewed as an extension of behaviors that are associated with efficiency and success in legitimate businesses"). Given the history of violence between Monteiro and members of Team Supreme, it is reasonable to infer that the shooting at issue here was undertaken at least in part in order to further Team Supreme's territorial or reputational interests.

Therefore, the evidence here was sufficient for the judge to conclude that Team Supreme was an organized drug distribution group and, in light of the group's collective involvement in the killing and its cover-up, that the murder was committed in furtherance of the group's business interests. Accordingly, the

judge did not err in concluding that there was "reasonable suspicion that the murder of Troy Pina was in connection with organized crime."

*Conclusion.* Where, as here, a cooperating witness was a party to a telephone call and was authorized by law enforcement officers to record the call, and where the officers, acting in good faith, instructed the cooperating witness to attempt to elicit information during the telephone call regarding a murder under investigation that was allegedly committed by a group engaged in the distribution of illegal drugs, the recorded conversation was made in the course of an investigation of a murder committed in connection with organized crime, regardless of whether the cooperating witness actually attempted to elicit information regarding the murder. Therefore, the recording of the call was not an "interception" as defined in G. L. c. 272, § 99 B 4, and was lawful under the one-party consent exception to the warrant requirement. Because the judge erred in allowing the motion to suppress, we reverse the order and remand to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*