## COMMONWEALTH v. TIMOTHY HEARNS

Suffolk. January 7, 2014. - April 8, 2014.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Search and Seizure,* Electronic surveillance, Reasonable suspicion, Warrant,
   Affidavit. *Eavesdropping. Constitutional Law,* Admissions and confessions,
   Search and seizure, Reasonable suspicion, Waiver of constitutional rights.
   *Practice, Criminal,* Admissions and confessions, Interlocutory appeal, Mo-
   tion to suppress, Warrant, Affidavit.

A Superior Court judge properly denied a criminal defendant's pretrial motion
   to suppress his statements that were surreptitiously recorded by a cooperat-
   ing witness (witness), where a police officer's affidavit provided an adequate
   basis to conclude that the gang to which the defendant belonged qualified
   as an organized criminal group under the wiretap statute (statute), and
   where the Commonwealth, objectively, had a reasonable suspicion that the
   interception of conversations between the defendant, who had admitted
   involvement in the shooting at issue, and the witness would lead to evidence
   of a designated offense under the statute. [713-716]
A Superior Court judge erred in denying a criminal defendant's pretrial mo-
   tion to suppress statements he made during an interview with police, where
   his invocation of the right to remain silent was clear and unequivocal.
   [716-719]


INDICTMENTS found and returned in the Superior Court Depart-
ment on September 28, 2010.

A pretrial motion to suppress evidence was heard by *Mau-
reen B. Hogan,* J.

An application for leave to prosecute an interlocutory appeal
was allowed by *Gants,* J., in the Supreme Judicial Court for the
county of Suffolk, and the appeal was reported by him.

*Daniel Beck* for the defendant.

*Allison Callahan,* Assistant District Attorney (*Mark Hallal,*
Assistant District Attorney, with her) for the Commonwealth.

CORDY, J. On September 27, 2010, a Suffolk County grand
jury indicted the defendant, Timothy Hearns, for the May 8,
2010, murder of fourteen year old Jaewon Martin and wounding

of fifteen year old Dejontre Bell, in the Jamaica Plain section of Boston.[1] The defendant was known to be associated with the H-Block gang (H-Block), which was engaged in a feud with the Heath Street gang (Heath Street), on whose turf the shooting took place.

The Commonwealth believed that H-Block and Heath Street were highly organized and disciplined groups engaged in the supply and sale of illegal goods in adjoining neighborhoods in Boston, and that the murder was committed in connection with H-Block's criminal activities. Consequently, during the course of the investigation, it sought to record conversations of those H-Block members whose involvement in the murder was suspected. A cooperating witness consented to the recording of his conversations with the defendant and other H-Block members, and subsequently recorded a conversation with the defendant in which he admitted to the killing. Although this recorded conversation ultimately took place in an automobile and not in a home, out of an abundance of caution the Commonwealth had obtained a warrant, as provided for in *Commonwealth* v. *Blood*, 400 Mass. 61, 77 (1987) (warrant required, pursuant to art. 14 of Massachusetts Declaration of Rights, for surreptitious recording of oral communication in private home even if it comes within "one-party consent" exception of G.L. c. 272, § 99 B 4 and C 1) (*Blood* warrant), before surreptitiously recording the conversation.

The defendant filed a motion to suppress the recorded conversation. He argued that the evidence was insufficient to establish that the shooting of the victims was a "designated offense" occurring in "connection with organized crime" as defined in G. L. c. 272, § 99 B 7, and, therefore, the one-party consent exception to the proscription of the "secret transmission or recording of oral communications without the consent of all parties" was inapplicable and the warrant was inadequate.

---

[1] The grand jury returned one indictment charging murder in the first degree; three indictments charging armed assault with intent to murder; two indictments charging assault and battery by means of a dangerous weapon; one indictment charging possession of a firearm without a license, second offense; one indictment charging possession of a firearm without a firearm identification (FID) card; and one indictment charging unlawful possession of a loaded firearm.

*Commonwealth* v. *Tavares*, 459 Mass. 289, 298 (2011), quoting *Blood*, *supra* at 66. In his motion to suppress, the defendant also argued that statements he made to the police during a post-arrest interview were not voluntary and were not preceded by adequate Miranda warnings and therefore should be suppressed.

After hearing, a Superior Court judge denied the defendant's motion to suppress as to all of his statements. The defendant sought leave to pursue an interlocutory appeal pursuant to Mass. R. Crim. P. 15, as appearing in 422 Mass. 1501 (1996), which was granted by a single justice of this court. On appeal, he raises substantially the same argument regarding the surreptitious recording of his conversation.[2] However, as to his post-arrest statement, the defendant does not challenge the judge's rulings that it was voluntary and preceded by a voluntary waiver of his Miranda rights; rather, he contends that he invoked his right to remain silent during the police interview and that his invocation was not respected by the interrogating officers.

We affirm the motion judge's denial of the motion to suppress with respect to the defendant's recorded conversation, and reverse her denial with respect to the statements he made during the custodial interview after invoking his right to remain silent.

1. *Background.* We recite the relevant facts regarding the shooting as they appear in Sergeant Detective Joseph G. Mac-Donald's affidavit in support of the *Blood* warrant.

MacDonald worked in the homicide unit of the Boston police department. He had been a Boston police officer for twenty-five years, and his experience included assignments with the organized crime strike force of the United States Attorney's office for the District of Massachusetts, the special investigations bureau of the Suffolk County district attorney's office, the organized crime unit, and the youth violence strike force. MacDonald also served as a sergeant detective in the community disorders unit. The information in the affidavit was drawn from his extensive experience and familiarity with organized criminal organizations in the neighborhoods of Boston, from his personal involvement

---

[2]The defendant also argues for the first time on appeal that we ought to extend our ruling in *Commonwealth* v. *Blood*, 400 Mass. 61, 77 (1987), relating to the surreptitious recording of oral communications in a private home to communications taking place in a vehicle. We decline to do so.

in the investigation, and from "reports made by other agents of the [Boston police department] and other [F]ederal, [S]tate and local law enforcement agencies."

On May 8, 2010, officers went to a basketball court on Heath Street in Jamaica Plain in response to a radio call and discovered Martin suffering from a gunshot wound to the chest and Bell suffering from gunshot wounds to his chest and arm.[3] Through eyewitness accounts, officers were able to determine that the shooter, a black male, got out of a green Acura automobile, approached the victims, shot at both victims multiple times, fled back into the vehicle, and drove away. A black sport utility vehicle (SUV) was also seen leaving the scene behind the green Acura.

After reviewing video surveillance, the police determined that the Acura belonged to Daron Silvelo (Daron), who admitted that he and his brother Ramon Silvelo-Miles (Ramon) had been in the automobile that day. Cellular telephone records confirmed that they were both near the scene of the shooting when it took place.

On June 18, 2010, Gregory Tillery, an admitted associate of H-Block,[4] told MacDonald that on May 10, 2010, the defendant, a known member of H-Block, told him that he went on a "mission"[5] with "Double R" (Ramon) and "Day Reeze" (Daron) in Ramon's Acura. The defendant added that "Hood" (James McGee) and "Ribs" (Robert Heckstall) followed the defendant to the shooting in a black Ford Expedition SUV, in order to offer guidance to him, Ramon, and Daron. The defendant told Tillery that when the group arrived at Heath Street, the defendant got out of the vehicle, walked up to the victims, and shot both of them.

MacDonald knew McGee and Heckstall to be senior members of H-Block, responsible for directing younger gang members

---

[3]Martin was pronounced dead at Brigham and Women's Hospital shortly after arriving there. Bell had been grazed by a bullet, and he survived.

[4]According to MacDonald, H-Block counted as its turf "a geographical location in the area of Humbolt Avenue, Harrison Street, Hollander Street[,] Homestead Street[,] and Holworthy Street."

[5]MacDonald stated that he was aware that going on a "mission" was "common vernacular for being sent to accomplish a violent goal on behalf of the gang, such as a shooting."

"to distribute narcotics and commit violent offenses for the benefit of the gang organization." MacDonald also knew that Ramon was an associate of H-Block, and that he had been arrested in the past for unlawfully possessing a firearm and distributing narcotics. Tillery further informed MacDonald that guns belonging to H-Block were kept at a central apartment and that H-Block associates picked up guns at this location before going on their "missions" and brought them back when they were finished.

MacDonald further averred that based on his experience, as well as that of other members of the Boston police department, H-Block and Heath Street were two rival organized and disciplined gangs engaged in the supply of illegal goods and services such as drugs and firearms in Boston, that members of these gangs regularly used weapons and violence as part of their ongoing criminal enterprises, and that "[t]hey commit[ted] violent acts such as murder and shootings to attack and pay-[]back their rival gangs." MacDonald also averred that Heath Street and H-Block were engaged in an "on-going feud," and that, as part of such feuds, gang members commit violent acts on individuals located in geographical areas controlled by rivals. Heath Street counted the area where the victim was killed as part of its "turf,"[6] and MacDonald believed that the defendant, Ramon, Daron, Heckstall, and McGee embarked on a "mission" to travel to Heath Street's "turf" and murder individuals in that territory.[7]

D.B., a cooperating witness, told MacDonald that the defendant had confessed his participation in the murder to him. MacDonald believed that the defendant and other members of H-Block would have further discussions about the murder with D.B., and gained D.B.'s consent to be fitted with a concealed recording device.

After MacDonald was granted a *Blood* warrant and D.B. was outfitted with an audio recording device, the defendant described to D.B., while the two sat in an automobile, how he committed the shooting.

---

[6]According to MacDonald, Heath Street "represent[ed] a geographical location in the area of Parker Street, Heath Street, and Columbus Avenue."

[7]Martin was not a member of the Heath Street gang, and had no known gang affiliations.

a. *Custodial interview.* On July 30, 2010, the defendant was
arrested and interviewed by MacDonald. He was properly
informed of the Miranda rights and consented to the recording
of the interview. MacDonald then informed the defendant that
the police had put together a case showing that he had shot and
killed Martin. The defendant admitted that he was a member of
H-Block, but denied being involved in a feud with anyone.

Immediately thereafter, the defendant asked, "Can you tell
me how you guys got this case together?" MacDonald replied,
"Well that's something that we will discuss in court." The
defendant then responded, "Well then, I don't want to talk. I
haven't got nothing to say."[8] After this response, MacDonald
implied that the shooting may have been an accident, and that
the defendant had an opportunity to perhaps be convicted of
manslaughter if he admitted that it was an accident.[9] The defend-
ant responded, "I didn't shoot nobody," and MacDonald con-
tinued to ask questions and elicit responses until the defendant
eventually said, "[I]f I'm under arrest, you all can take me
away, because I haven't got nothing else to say." At that point
the interview ended.

b. *Motion to suppress.* The defendant moved to suppress both
the surreptitiously recorded statement and his statement to police
following his arrest. At the hearing on the motion, the judge
considered MacDonald's affidavit as well as his testimony that
he had obtained the defendant's board of probation record dur-
ing the course of his investigation and prior to the recorded
conversation, and learned from the record that the defendant

---

[8]In her findings of fact, the motion judge found that the defendant's state-
ment was, "Mmm, well then, I don't want to talk, I got nothing to say." We
refer to the statement as it appears in the official transcript.

[9]MacDonald's full statement was as follows:

"Okay. We understand that, you know, sometimes during an incident
we have, you know, people that you could be upset with. And at times
accidents happen. The intended person was the wrong person, and it
wasn't intentional to shoot that person — such as we believe this case.
And there's a difference there between first degree murder and a
manslaughter or second degree murder. And the opportunity is now for
you — if you want — you don't have to have it — is to state whether
it — was it an accident? You didn't mean to shoot that kid? You have a
problem with Heath Street."

had previously been convicted of illegal possession of firearms and drug distribution offenses.[10]

In denying the defendant's motion as to all statements, the judge concluded that the recorded conversation need not be suppressed because the Commonwealth had reasonable suspicion to believe that the shooting was undertaken in an attempt to further the interests of H-Block gang's organized and disciplined criminal enterprise. In doing so, she considered both the warrant affidavit and MacDonald's testimony regarding the defendant's criminal record, as she believed that a *Blood* warrant was not required to surreptitiously record the defendant in an automobile under the one-party consent exception and thus she could consider relevant evidence outside of the affidavit. The judge found that the evidence sufficed to show that the gang was engaged in the sale of narcotics, the pursuit of which inferably may have motivated the shooting. She also found that significant signs of organization and discipline were present where the members of H-Block picked up and dropped off their firearms at a central location and where the shooters were sent out on a "mission" and accompanied by senior members of the gang.

The judge also found that the postarrest statements made by the defendant to police were the result of a knowing, intelligent, and voluntary Miranda waiver. Further, although the defendant did not raise the issue, she considered whether the defendant clearly and unequivocally invoked his right to remain silent when he said, "[W]ell then, I don't want to talk." She concluded that he did not, and that the statement was merely a negotiating ploy in which he implied that his desire to talk to police was conditioned on police informing him about their case in an attempt to discern the strength of the evidence against him.

2. *Discussion.* a. *Motion to suppress recorded conversation.* The first issue before us is whether the judge properly denied the defendant's motion to suppress oral communications that were surreptitiously recorded by D.B. at the behest of the Com-

---

[10]Specifically, the judge found that the defendant had been convicted of illegal possession of a firearm and assault and battery by means of a dangerous weapon in 2009, and of possession with intent to distribute cocaine in both 2008 and 2005. She added that he had been arrested at least nine other times.

monwealth. In reviewing the denial of a motion to suppress, we give substantial deference to the motion judge's findings, but conduct an independent inquiry to determine whether the judge correctly applied the law. *Commonwealth* v. *LeBlanc*, 433 Mass. 549, 554 (2001). The defendant argues that neither the warrant nor the one-party consent exceptions to the wiretap statute (G. L. c. 272, § 9) applied, and therefore his communications were impermissibly recorded. We disagree.

The wiretap statute prohibits all surreptitious recording of oral communications, except as provided in a few narrow exceptions. G. L. c. 272, § 99 C 1. Of primary relevance here is the one-party consent exception, which allows for the recording of oral communications where the party surreptitiously recording the communications "is an investigative or law enforcement officer investigating a 'designated offense,' and that officer is either (1) a party to the communication, or (2) has advance authorization from a party to the communication to intercept the conversation." *Tavares*, 459 Mass. at 297, citing *Commonwealth* v. *Thorpe*, 384 Mass. 271, 275-276 (1981), cert. denied, 454 U.S. 1147 (1982).[11] A "designated offense" is an offense enumerated in § 99 B 7, which includes murder and assault and battery by means of a dangerous weapon, occurring "in connection with organized crime." "Organized crime" consists of a "continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services." G. L. c. 272, § 99 A.

Whether the recording in this case properly comes within the one-party consent exception depends on whether the Commonwealth's "decision to intercept was made on the basis of a reasonable suspicion that interception would disclose or lead to evidence of a designated offense in connection with organized crime." *Thorpe*, 384 Mass. at 281. "The standard of reasonable suspicion is an objective one; it is met by a showing of articulable facts from which a reasonable person could conclude that

---

[11]The statute also allows for recording with a valid warrant issued in conformity with the requirements set forth in G. L. c. 272, § 99 D 1 d and E through M. This is different from a *Blood* warrant, which is required in addition to the one-party consent exception in the context of a private home, and the Commonwealth correctly concedes that it did not obtain such a warrant, and thus relies only on the one-party consent exception.

interception would lead to evidence of a designated offense."
*Id.*

We agree with the motion judge that MacDonald's affidavit, although conclusory in part, provided an adequate basis from which to conclude that H-Block was sufficiently organized and disciplined, and engaged in the supply of drugs and guns, to qualify as an organized criminal group under the wiretap statute. That basis included MacDonald's statements regarding H-Block's activities and its membership drawn from his extensive knowledge and experience with organized groups selling drugs and guns in the neighborhoods of Boston, much of which was gained through police assignments focused specifically on such organized criminal activity. It further included corroborating information gathered during interviews of members of H-Block either conducted directly by MacDonald or by other officers during the course of their investigation, regarding the organization and distribution of weapons belonging to H-Block, the role of senior H-Block members in directing the drug selling and violence of junior members, and the use of "mission" assignments to carry out the gang's criminal objectives.[12] It is also apparent that the crimes allegedly committed by the defendant are among those enumerated within the definition of "designated offense."

Thus, the inquiry becomes whether there was sufficient information available to the Commonwealth from which it might reasonably have concluded that the shooting under investigation was committed in connection with the organized criminal activity of the H-Block gang. In this regard, the information available to the Commonwealth was substantially greater than that available in *Tavares*, 459 Mass. 289. In that case, the information was that the murder at issue was not authorized by the criminal group with which the defendant was affiliated and, indeed, suggested that his actions were of a "roguish or free-agent quality" consistent with his "allegedly violent impulses, rather than an organized criminal enterprise." *Id.* at 302. The defendant in *Tavares* appeared to have acted alone in mistakenly

---

[12]The judge also properly considered the defendant's record of criminal convictions of drug and firearm offenses as corroborating his role in, and the nature of, the H-Block criminal enterprise with which he was associated.

killing his victim against the wishes of another gang member. *Id.* Here, the information set forth in the affidavit and provided to MacDonald by individuals affiliated with H-Block was that the defendant, an H-Block member and known drug dealer, was sent on a "mission" by H-Block, a mission that was guided and observed by senior members in the organization, and that the mission was part of an ongoing "feud" (or war) between turf-conscious criminal organizations involved in the sale of illegal drugs in adjoining territory.

Although the specific origins and dimensions of the ongoing feud were not included in the affidavit, it is reasonable to infer from the information available to the police at the time that the shooting at issue was intended as an act of intimidation directed at Heath Street and related to its competing illegal enterprises. In these circumstances, the Commonwealth, objectively, had a reasonable suspicion that the interception of conversations between a cooperating witness and an H-Block member, who had admitted involvement in the shooting, would lead to evidence regarding the commission of the crime, its motivation, and its relationship to H-Block's organized criminal activities. That is, evidence of a "designated offense."

For these reasons, we find that the motion judge did not err and affirm her decision denying the defendant's motion to suppress the conversation that was the subject of surreptitious recording.

b. *Invocation of right to remain silent.* Next, we consider the defendant's argument that the motion judge erred in denying his motion to suppress statements he made during his interrogation after what he claims to have been an invocation of his right to remain silent.[13]

Prior to any custodial questioning, a defendant must be warned, among other things, "that he has the right to remain silent." *Miranda* v. *Arizona*, 384 U.S. 436, 479 (1966). "[A]fter a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the

---

[13]Although the defendant raises this argument for the first time on appeal, in her decision the motion judge considered whether the defendant invoked his right to remain silent and made findings to that effect. Consequently, we consider the issue.

suspect clearly requests an attorney," *Davis* v. *United States*, 512 U.S. 452, 461 (1994), or invokes his right to remain silent, *Michigan* v. *Mosley*, 423 U.S. 96, 103-104 (1975). See *Berghuis* v. *Thompkins*, 560 U.S. 370, 387-388 (2010) ("Any waiver, express or implied, may be contradicted by an invocation at any time").

Once he has been advised of the protections afforded by *Miranda*, the "responsibility for invoking the protections guaranteed by [*Miranda*] and art. 12 [of the Massachusetts Declaration of Rights] rests squarely in the hands of [the] criminal defendant[]." *Commonwealth* v. *Baye*, 462 Mass. 246, 252 (2012), quoting *Commonwealth* v. *Clarke*, 461 Mass. 336, 342 (2012). After waiving those protections, the defendant bears the burden of showing that his subsequent invocation of his right to remain silent was clear, unequivocal, and unambiguous. *Baye*, *supra*. See *Commonwealth* v. *Clarke*, 461 Mass. 336, 347-349 (2012). In determining whether the invocation was adequately clear, we consider the totality of the circumstances surrounding the alleged invocation. See *Commonwealth* v. *Almonte*, 444 Mass. 511, 518-519, cert. denied, 546 U.S. 1040 (2005). In doing so, we consider whether a reasonable police officer in the circumstances would understand the statement to be an invocation. *Clarke*, *supra* at 342. *Davis* v. *United States*, 512 U.S. at 459.

The defendant's statement, "Well then, I don't want to talk. I haven't got nothing to say," was a clear invocation of his right to remain silent. The defendant made the statement mere moments after waiving his Miranda protections, indicating an immediate unwillingness to talk. See *Commonwealth* v. *Jackson*, 377 Mass. 319, 322, 324 (1979) (right invoked where defendant said he "didn't have anything to say" right after being read Miranda warnings). He did not immediately continue speaking after asserting his right to silence; rather, he remained silent while MacDonald spent a considerable amount of time persuading him to continue with the interview.[14] Cf. *Commonwealth* v. *Westmoreland*, 388 Mass. 269, 277-278 (1983) (statement, "I'm

___

[14]That the defendant answered questions after MacDonald's efforts to persuade him to continue is not dispositive whether he intended to assert his right to remain silent where his initial invocation was clear. See *Commonwealth*

not making any statement knowing that I am being held for this alleged murder of said person," not invocation when immediately followed with proclamations of innocence without provocation). Simply put, his choice of words fell well within the range of cases where we have found a clear and unequivocal invocation. See, e.g., *Commonwealth* v. *Santos*, 463 Mass. 273, 285 (2012) (statement, "I'm not going on with this conversation," was invocation); *Commonwealth* v. *Connolly*, 454 Mass. 808, 828 (2009) (defendant's statement that he "did not have anything to say at this time" was invocation); *Commonwealth* v. *Contos*, 435 Mass. 19, 28-29 (2001) (statement, "I think at this point we need to stop. . . . I think we're going to stop, and I think I'm going to get a lawyer. If this is the way this is going, you're either accusing me or charging me," was invocation of right to counsel). Compare *Commonwealth* v. *Leahy*, 445 Mass. 481, 488-489 (2005) (statement, "Not right now, in a minute, I need to figure some things out," in response to request for interview not invocation).

Even if the officers were uncertain whether the defendant had chosen to invoke his right to remain silent, we have said that the proper course of action in circumstances such as these is to attempt to clarify the defendant's statement to determine what he had intended. *Santos*, 463 Mass. at 286 (where reasonably uncertain, "an interrogating officer must cease the interrogation, but is entitled to ask a question to clarify the defendant's intent"). Rather than attempting to clarify the defendant's intentions, MacDonald attempted to convince the defendant to continue talking, erroneously telling him that he would be liable only for manslaughter or murder in the second degree if Martin had not been his intended target.[15]

Finally, we do not agree with the Commonwealth's argument,

v. *Hoyt*, 461 Mass. 143, 152 (2011), quoting *Smith* v. *Illinois*, 469 U.S. 91, 100 (1984) (police may not ignore "the long-standing principle that 'postarrest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself' ").

[15]MacDonald's assertion was a misstatement of the law. Under Massachusetts law, even if the defendant had intended the death of another and mistakenly killed the victim, he would be guilty of murder in the first degree under the theory of transferred intent, not murder in the second degree or manslaughter. See *Commonwealth* v. *Fisher*, 433 Mass. 340, 345-347 (2001).

or the motion judge's ruling, that the defendant's statement was merely a negotiating ploy, indicating that he wished to continue with the interview contingent on the actions of MacDonald.[16] On review of the interrogation, no such negotiation took place. The defendant asked MacDonald if he would outline the evidence against him, and when MacDonald refused, the defendant indicated that he no longer wished to speak. What followed was not a negotiation, but further interrogation by MacDonald in an attempt to persuade the defendant to continue the interview. See *Jackson,* 377 Mass. at 325-326 (statements by police that evidence "pointed to" defendant after invocation represented resumed interrogation in attempt to restart interview). When considering the statement in context, it is clear that the defendant invoked his right to remain silent and gave his reason for doing so — namely, an unwillingness to talk to police because they would not reveal the evidence against him. The defendant's "statement of the reason why" he invoked his Miranda protections "does not render the request ambiguous." *Santos,* 463 Mass. at 285.

3. *Conclusion.* We affirm the order denying the defendant's motion to suppress with respect to his surreptitiously recorded statements and reverse the order with respect to the statements the defendant made following his invocation of the right to remain silent.

*So ordered.*

---

[16]Even if the defendant were expressing a contingency to his refusal to speak, his statement was functionally identical to his final statement, "And if I'm under arrest, you all can take me away, because I haven't got nothing else to say." As the motion judge found, the police immediately understood that statement as the defendant "clearly and unequivocally assert[ing] his rights." In both instances, the defendant stated an unwillingness to continue with the interview due to the actions of the police.