NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11005

COMMONWEALTH  vs.  JOHN BURGOS.


Bristol.     September 5, 2014. - November 21, 2014.

Present: Gants, C.J., Spina, Botsford, Lenk, & Hines, JJ.


Electronic Surveillance.  Evidence, Wiretap, Corroborative
    evidence, Telephone conversation.  Homicide.
    Constitutional Law, Assistance of counsel.  Due Process of
    Law, Assistance of counsel.  Telephone.  Practice,
    Criminal, Capital case, Motion to suppress, New trial,
    Assistance of counsel.



Indictment found and returned in the Superior Court
Department on June 24, 2009.

A pretrial motion to suppress evidence was heard by Thomas
F. McGuire, Jr., J.; the case was tried before Gary A.
Nickerson, J., and a motion for a new trial, filed on March 1,
2013, was considered by him.


Janet Heatherwick Pumphrey for the defendant.
Tara L. Blackman, Assistant District Attorney, for the
Commonwealth.


BOTSFORD, J.  The defendant appeals from his conviction of

murder in the first degree.  His primary argument on appeal is

that his motion to suppress a secretly recorded conversation

between him and an informant working with the police was erroneously denied, that evidence of the conversation should have been excluded at trial, and that his conviction must be reversed as a result.[1] We agree and reverse the defendant's conviction.

Background. 1. Electronically recorded conversation. Dana Haywood was shot and killed on July 4, 2005, in the Monte Park neighborhood of New Bedford. Over three years later, in February of 2009, an assistant district attorney in the Bristol district received a letter from Rico Almeida, who was then sharing a cell with the defendant in the Bristol County house of correction. Almeida wrote that the defendant had been one of the participants in the shooting death of Haywood on July 4, 2005, that the defendant had told Almeida "how they did it, where, and when," and that Almeida would be able to arrange for the defendant to repeat this admission to the shooting of the

---

[1] In relation to the same recorded conversation, the defendant also challenges the constitutional validity of the search warrant obtained by police officers pursuant to G. L. c. 276, § 1, and Commonwealth v. Blood, 400 Mass. 61, 77 (1987), based on his claim that the warrant was not supported by probable cause. In the circumstances of this case, the police were not required to seek and obtain a search warrant pursuant to Blood, because the conversation sought to be recorded was always intended to, and did, take place in a jail cell -- a space that we decline to treat as the equivalent of a private home. The issue here, rather, is solely whether the conversation was recorded in violation of the wiretap statute, G. L. c. 272, § 99. Accordingly, we do not reach the defendant's constitutional argument.

victim. Almeida offered to wear a concealed recording device and record the proposed conversation. In response to the letter, the Commonwealth submitted an affidavit of Trooper Anthony Spencer of the State police to a judge in the Superior Court, and obtained a search warrant authorizing the electronic recording of conversations between the cooperating witness (i.e., Almeida) and the defendant.[2]

In an affidavit dated March 2, 2009, Spencer begins by reciting the following information about police officers' prior dealings with Almeida in a homicide investigation involving William Payne. Payne was shot and killed on February 3, 2008, in New Bedford. During the investigation of the Payne homicide, in October of 2008, State police Trooper Paul Dockrey had interviewed Almeida, who at the time was being held in custody at the Bristol County house of correction. Dockrey learned from Almeida that the latter had information about Payne's murder from two "gang business meetings" where he and his friends discussed how to handle their friend Payne's homicide. In particular, Almeida learned specific details about "how the Payne homicide went down." Based on these facts, Dockrey sought

---

[2] There appears to be no dispute that the Commonwealth sought the warrant under the general search warrant statute, G. L. c. 276, §§ 1 et seq., and Blood, 400 Mass. at 77, and not under the section of the wiretap statute authorizing search warrants to conduct an "interception," G. L. c. 272, § 99 F. A so-called Blood warrant was not necessary in this case. See note 1, supra.

and obtained a search warrant that authorized Almeida to record telephone conversations electronically with the suspects in the Payne murder, and Almeida was released on bail from custody in order to do so.  Once he was released, however, Almeida failed to secure the recordings.

Spencer's affidavit then turns to the homicide investigation relating to Dana Haywood, the victim in this case.  It states that in a letter dated February 14, 2009, and sent to an assistant district attorney, Almeida provided information about the July 4, 2005, homicide, and indicated he was willing to assist law enforcement in the investigation and to "wear a 'wire' for this purpose."  Spencer's affidavit then states as follows:

> "I spoke with Det. Lt. Scott Sylvia, New Bedford Police Major Crimes Division, and he informed me that John Burgos is a member of the United Front gang.  He has been associated with the gang for approximately 12 years.  According to Det. Lt. Sylvia the United Front gang is a group of individuals that operate in and around the United Front Homes located adjacent to Chancery and Kempton Streets.  The members are known to be heavily involved in the distribution of illegal narcotics.  The members are also known to commit violent crimes including possession of firearms and multiple shootings.  Mr. Burgos himself was also a target of a shooting on May 21, 2006 along with Justin Barry who was murdered in the shooting.  This shooting was perpetrated by rival Monte Park members including David DePina.  Mr. DePina is presently awaiting trial in the fatal shooting of Barry and the shooting of Mr. Burgos.

> "Tpr. Ann Marie Robertson, Cold Case Unit Mass. State Police, advises me that Dana Haywood was a known member of the Monte Park Gang at the time of his death.  Monte[] Park

Gang is a group of individuals that are known to distribute illegal narcotics by Monte[] Park on Acushnet Avenue in the city of New Bedford. The gang members are also known to commit violent crimes including illegal possession of firearms and multiple shootings. Tpr. Robertson informs me that investigators believe that Dana Haywood's murder is suspected to be in retaliation for the fatal shooting of Cecil Lopes which occurred on October 31, 2004. The Cecil Lopes murder took place at the United Front Homes on Chancery Street in the city of New Bedford. The Cecil Lopes murder involved a shooting directly outside a residence in the United Front Housing complex. Tpr. Robertson informs me that Mr. Haywood was shot one block from the Monte Park Housing complex on Russell Street in the city of New Bedford. Tpr. Robertson further advises me that eyewitnesses to Mr. Haywood's shooting saw 3 young black males, at least 2 of who [sic] were shooting. The 3 males fled from Mr. Haywood's body to an awaiting vehicle."

Following these two paragraphs, the affidavit describes the contents of Almeida's February 14, 2009, letter to the assistant district attorney:

"Almeida stated in his letter that his cell mate, John Burgos [the defendant] was one of the shooters who killed Dana Haywood [the victim] on July 4, 2005. Almeida also states John Burgos told him why, where and when they did it. Almeida believes he can get Burgos to make those statements again. Almeida requests that this investigation be expedited due to the fact that Burgos will be released soon."

The affidavit then describes the manner in which the electronic recording by Almeida would be set up.

Based on Spencer's affidavit, the Superior Court judge issued the requested search warrant. Police officers then provided Almeida with an electronic recording device that Almeida hid on his person and used to secretly record a conversation with the defendant in their jail cell on March 3,

2009. During the conversation, which lasted over sixty minutes, the defendant admitted to being one of the shooters involved in killing the victim on July 4, 2005, and described the actual shooting incident in some detail, as well as his attitude toward it.

Following the defendant's indictment on charges of murder and unlawful possession of a firearm, he filed a motion to suppress the electronically recorded statements. He argued that the recording was obtained in violation of the wiretap statute, G. L. c. 272, § 99, because the Commonwealth had not made the requisite showing that the recording would lead to evidence about a "designated offense" committed "in connection with organized crime." See G. L. c. 272, § 99 B 4, 7. The defendant also argued that the search warrant had been issued without probable cause. In opposition to the motion, the Commonwealth did not offer any evidence other than Trooper Spencer's affidavit that had previously been submitted in support of the Commonwealth's search warrant application.

A second Superior Court judge held a nonevidentiary hearing on the defendant's suppression motion, and thereafter denied it. The judge concluded in substance that Spencer's affidavit articulated sufficient facts to indicate that the victim's

murder was committed in connection with organized crime because the facts showed the murder was "gang related."[3]

The defendant was tried and convicted of murder in the first degree in November, 2010.[4] He filed a timely notice of appeal and thereafter filed a motion for new trial that raised a claim of ineffective assistance of trial counsel. The motion was remanded to the Superior Court. After receiving memoranda from the parties, the trial judge denied the motion in an explanatory order. The defendant filed a timely appeal from the denial. We have consolidated for review the defendant's appeal from his conviction and from the denial of his motion for a new trial.

2. Evidence at trial. We summarize briefly what the jury could have found based on the trial evidence. On October 31, 2004, some nine months before the victim was killed on July 4, 2005, Cecil Lopes, a resident of the United Front housing development in New Bedford, had been killed. In November, 2004, the defendant, who also lived in the United Front development,

_____

[3] The judge also concluded that the search warrant was supported by probable cause because the Commonwealth had established the informant Almeida's basis of knowledge and veracity. There is no need for us to address the probable cause issue. See note 1, supra.

[4] The judge allowed the defendant's motion for a required finding of not guilty on the firearm charge before the case went to the jury.

had made a telephone call to his brother.[5]  In this conversation, he and his brother had talked about how Lopes's photograph was in the newspaper and the defendant had stated that he had put the image from the newspaper on his wall.  They also had discussed that someone named "Aceon" was responsible for the killing.  Aceon was known to be associated with the Monte Park area of New Bedford.  The Commonwealth's theory at trial was that the defendant and his friend William Payne killed the victim in retaliation for Lopes's murder.

At the scene of the shooting resulting in the victim's death, police recovered a blue baseball cap and some bullet shell casings.  A bystander had seen three individuals at the scene, all of whom were wearing white T-shirts.  Later that night, the defendant and Payne were at the home of Payne's grandfather who observed the defendant to be laughing and behaving differently than he usually did.

Almeida, who had entered into a cooperation agreement with the Commonwealth, was a witness at trial.  He testified about, among other subjects, his March, 2009, electronically recorded

---

[5] This call was made while the defendant was being held in custody at a Bristol County correctional facility.  On appeal, he challenges the admissibility of statements from this call, which we discuss infra.

conversation with the defendant.[6]  A recording of the recorded conversation was then played for the jury and entered into evidence as an exhibit.  In that conversation, the defendant agreed with Almeida's assertion that he and Payne shot the victim, described the shooting as "executionist style," and made statements suggesting a lack of any feelings of guilt or remorse.  He also indicated that he had been wearing a white T-shirt at the time of the shooting, and that the victim had been killed in retaliation for the death of Cecil Lopes.

Deoxyribonucleic acid (DNA) testing was performed on the baseball cap found at the scene of the shooting.  It revealed that the defendant was the source of the major profile taken from the swabbings and scrapings of the baseball cap, and that the victim was excluded from that profile.  The shell casings found at the scene were compared to a shell casing found three months later in a car driven by Payne.  The State trooper who did the comparison opined that the casings were fired from the same unknown weapon.

Discussion.  1.  Motion to suppress recorded statement.
The defendant contends that the secret recording of his

---

[6] Rico Almeida was vigorously cross-examined by the defendant's counsel.  Almeida admitted, among other things, that he had misrepresented some of the facts in his February 14, 2009, letter to the assistant district attorney, particularly the fact that the defendant had told him details about the victim's murder prior to the jail cell recording.  He also admitted to lying to a grand jury in a prior case.

conversation with Almeida should have been suppressed because the Commonwealth obtained this evidence in violation of the wiretap statute, G. L. c. 272, § 99. He argues principally that the Commonwealth failed to show that the recording was made during an investigation of a designated offense committed "in connection with organized crime," as that statute requires. See G. L. c. 272, § 99 B 4, 7.

The Commonwealth's wiretap statute generally prohibits the secret recording of oral communications, see G. L. c. 272, § 99 C 1, but also contains some narrow exceptions to this prohibition. One of those exceptions, described in § 99 B 4, is for a one-party consent recording, where the person who is conducting the surreptitious recording "is an investigative or law enforcement officer investigating a 'designated offense,' and that officer is either (1) a party to the communication, or (2) has advance authorization from a party to the communication to intercept the conversation." Commonwealth v. Hearns, 467 Mass. 707, 714 (2014), quoting Commonwealth v. Tavares, 459 Mass. 289, 297 (2011).[7] See Commonwealth v. Thorpe, 384 Mass. 271, 275-276 (1981), cert. denied, 454 U.S. 1147 (1982).

---

[7] A surreptitious or secret recording of the contents of wire or oral communications is referred to in the wiretap statute as an "interception," and the exception for a one-party consent secret recording is included within the statutory definition of "interception." In particular, G. L. c. 272, § 99 B 4, provides:

The Commonwealth from the outset of this case has characterized the recording at issue here as fitting within the one-party consent exception set out in G. L. c. 272, § 99 B 4. There is no dispute that most of the requirements of that exception are met here: the recording was carried out by law enforcement officers investigating the victim's murder; murder is one of the crimes listed in the definition of "designated offense" in § 99 B 7; and Almeida, one of the parties to the recorded conversation, had authorized (in fact, requested) the officers in advance to conduct the recording. But, as the defendant contends, for the victim's murder actually to qualify as a "designated offense" within the meaning of § 99 B 7, it must have been a murder committed "in connection with organized crime" -- that is, it was necessary for the Commonwealth "to show that the decision to intercept was made on the basis of a reasonable suspicion that interception would disclose or lead to

---

"The term 'interception' means to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication; provided that it shall not constitute an interception for an investigative or law enforcement officer . . . to record or transmit a wire or oral communication if the officer is a party to such communication or has been given prior authorization to record or transmit the communication by such a party and if recorded or transmitted in the course of an investigation of a designated offense as defined herein" (emphasis added).

evidence of a designated offense in connection with organized crime." Thorpe, 384 Mass. at 281. In this context, the term "organized crime" means "a continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services." G. L. c. 272, §99 A. See Thorpe, supra at 277.

To show a nexus to organized crime, there must be "some evidence of an ongoing illegal business operation." Tavares, 459 Mass. at 300, quoting Commonwealth v. Long, 454 Mass. 542, 556 (2009). The Commonwealth also must demonstrate a "high degree of discipline and organization" among the suspected members of the criminal enterprise. Tavares, supra at 300, quoting Commonwealth v. D'Amour, 428 Mass. 725, 737 (1999). However, facts suggesting "coordination of efforts among cohorts standing alone is insufficient. . . . 'For a conspiracy to commit an offense enumerated in G. L. c. 272, § 99 B 7, to rise to the level of organized crime, there must, at the very least, be an organized plan from which one reasonably may infer the existence of an ongoing criminal operation.'" Tavares, supra at 301, quoting Long, supra at 557. Finally, the Commonwealth must show that the designated offense was committed to promote "the supply of 'illegal goods and services' or the furtherance of an 'ongoing criminal business operation.'" Tavares, supra at 301, quoting G. L. c. 272, § 99A.

In recent years, this court has decided a number of cases involving the one-party consent exception under our wiretap statute, and the facts of those cases offer useful comparisons here. In Tavares, the Commonwealth failed to show a nexus to organized crime when requesting a wiretap in an investigation of a murder resulting from a drive-by shooting. The facts contained in a State trooper's supporting affidavit revealed that the defendant and the other men suspected of participating in the crime were known to carry guns and commit violent crimes, and that the defendant had purchased a gun from a fellow group member. Tavares, 459 Mass. at 299. The facts also indicated that the defendant and the other men borrowed a car in advance, met at a central location before the shooting, and returned to hide the guns at the same site afterwards, suggesting some coordination and that there was some degree of a hierarchy within the group. Id. at 291, 299. However, we concluded that taken together, the facts in Tavares did not support a connection to organized crime because there was no information beyond the speculative that the defendant or any other member of his group "was involved in a pecuniary enterprise, such as drug, gun, or contraband trafficking, or promoted some other unifying criminal purpose." Id. at 301. In addition, the evidence failed to show "other hallmarks of organized crime -- discipline, organization, and a continuing nature." Id. at 302,

quoting Long, 454 Mass. at 558. Finally, we observed that there was not a "scintilla of evidence in the [State trooper's] affidavit that the designated offense [the drive-by murder of the victim] was committed 'in connection' with [an] organized criminal trade." Tavares, 459 Mass. at 302.

In contrast, in Hearns, 467 Mass. at 710-711, we found a nexus to organized crime based on a detailed affidavit from a police officer outlining his direct knowledge that specific persons in the alleged criminal organization distributed narcotics and possessed firearms. The affidavit also contained information about the use of "mission" assignments "guided and observed by senior members in the organization" as "part of an ongoing 'feud' (or war) between turf conscious criminal organizations involved." Id. at 716. We concluded that "it is reasonable to infer from the information available to the police at the time that the shooting at issue was intended as an act of intimidation directed at [a rival gang] and related to its competing illegal enterprises." Id. Similarly, in Commonwealth v. Mitchell, 468 Mass. 417, 426 (2014), there was clear evidence that the defendant and his associates were involved in "a drug distribution enterprise." The defendant himself previously had been arrested in connection with this drug enterprise, along with a fellow associate who a witness confirmed was a known drug dealer. Id. Their enterprise was also highly coordinated, with

multiple members taking part in the shooting and several others assisting in hiding the gun and "conspiring to kill a potential witness." Id. at 427. Facts suggested that the murder was part of a "bitter and violent feud" between two rival organizations. Id. We stated that "[e]ven if the feud were purely personal, an illegal drug distribution business may see the perception of weakness as potentially fatal to an enterprise that wishes to protect its turf against competitors." Id. This conclusion, however, relied on clear evidence showing that the group was, in fact, operating an organized drug business.

On its facts, this case is much closer to Tavares than to Hearns and Mitchell. In contrast to the latter two cases, the only two relevant paragraphs of Trooper Spencer's affidavit in this case, quoted supra, set out relatively vague and conclusory "facts" about the existence of two rival gangs operating in different neighborhoods of New Bedford, both of which were involved in selling narcotics. These paragraphs, however, do not describe or even suggest a nexus between the victim's murder -- i.e., the offense being investigated -- and the narcotics or any other ongoing business enterprise of either gang. Spencer states in the affidavit that he has learned from other officers that the defendant was a longtime member of the United Front gang, that the gang is involved "in the distribution of illegal narcotics" inferably near the United Front Homes where the gang

operates, that the Monte Park gang of which the victim was a member distributes drugs near Monte Park, and that the victim's murder was believed to be in retaliation for the earlier murder of Cecil Lopes near the United Front Homes.  Nothing in the affidavit, however, indicates that the two gangs were engaged in a turf war or other dispute over drug dealing or any other "business" activities, and nothing connects the murder of the victim or even the defendant to the gangs' drug dealing operations or any other "business" activity.  Moreover, beyond the fact that eyewitnesses saw three individuals at the scene of the murder get into a waiting car, there is no evidence indicating that the trio were members of the United Front gang, much less evidence that the trio's actions that night were part of an organized, disciplined plan characteristic of a business enterprise.  Contrast Hearns, 467 Mass. at 715-716.  A retaliatory killing alone, without a clear link to the goals of a criminal enterprise, does not amount to a connection to organized crime.  See Long, 454 Mass. at 557-558.

Because Spencer's affidavit fails to show the requisite connection between the murder being investigated and "organized crime," the denial of the defendant's motion to suppress constituted error, and the defendant's recorded conversation with Almeida should not have been admitted in evidence at trial. The remaining question is the effect of the error.  We assume

for argument that the substantial likelihood of a miscarriage of justice standard applies.[8]  Under that standard, "a new trial is called for unless [the reviewing court is] substantially confident that, if an error had not been made, the jury verdict would have been the same."  Commonwealth v. Ruddock, 428 Mass. 288, 292 n.3 (1998).

The recorded conversation between the defendant and Almeida, in which the defendant admitted to having joined with Payne in murdering the victim and described the murder in some detail without indication of remorse or even regret, unquestionably constituted the centerpiece of the Commonwealth's case.  There were no eyewitnesses who identified the defendant as a shooter.  The closest evidence in this regard was that three young men in white T-shirts were observed at the scene, and that the defendant had on a white T-shirt that night.  The DNA evidence from the blue baseball cap at best places the defendant

---

[8] To consider the effect of the error, it is necessary first to identify the appropriate standard of review -- prejudicial error or substantial likelihood of a miscarriage of justice. The defendant moved to suppress evidence of the electronically recorded conversation before trial, but did not object to the admission of this evidence at trial.  Although the admission violated only the defendant's statutory rights under the wiretap statute, by raising his claim in his pretrial motion to suppress, which was heard and denied, he likely preserved his objection.  Nevertheless, we do not need to decide the preservation issue here because even if we assume that the objection was not preserved and the less favorable substantial likelihood of a miscarriage of justice standard applies, the defendant prevails.

at the scene of the shooting, but proves nothing more.  Although
the shell casings recovered by police at the scene of the crime
matched the shell casing found in Payne's car at a later point
in time, the actual murder weapon was never found.  Reviewing
this evidence, we cannot conclude with substantial confidence
that the jury would have reached the same verdict had the
recorded conversation between the defendant and Almeida been
excluded.[9]  See Ruddock, 428 Mass. at 292 n.3.  The defendant's
conviction must be reversed.

    2.  Motion for a new trial.  As he did in his motion for a
new trial, the defendant argues on appeal that he was deprived
of the effective assistance of counsel based on his trial
attorney's failure to move for suppression of all evidence of
his conversation with Almeida -- both the electronic recording
of it as well as testimony of Almeida relating to the contents

---

[9] At oral argument before this court, the Commonwealth
contended for the first time that there was no substantial
likelihood of a miscarriage of justice resulting from the
admission in evidence of the defendant's recorded conversation
with Almeida because Almeida himself had described the contents
of that conversation in his testimony before the jury.  The
point, presumably, was that evidence of the actual recording was
cumulative.  But actually hearing the defendant make the
statements at issue is far more powerful than listening to
testimony about them by Almeida.  Moreover, Almeida himself was
a witness testifying pursuant to a cooperation agreement with
the government; for this and other reasons, his credibility came
under substantial attack at trial.  In the circumstances, the
significance of the actual recorded conversation between Almeida
and the defendant, which featured the defendant explaining his
role and actions in the commission of the murder, cannot be
overstated.

of the conversation -- under the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.  More particularly, the defendant contends that because Almeida was an agent of the police at the time he secretly recorded the conversation with the defendant, and because the recorded conversation took place while the defendant was in custody, the conversation qualified as a "custodial interrogation."  Accordingly, evidence of the conversation was inadmissible because the defendant was not given Miranda warnings before the conversation took place and never waived his right to remain silent.  See Miranda v. Arizona, 384 U.S. 436, 444 (1966) ("the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination").  By never challenging this evidence on Fifth Amendment and art. 12 grounds, the defendant avers here, his trial attorney's actions fell "measurably below that which might be expected from an ordinary fallible lawyer," and deprived him of an "otherwise available, substantial ground" of defense.  Commonwealth v. Randolph, 438 Mass. 290, 295 n.9 (2002), quoting Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).

"It is not ineffective assistance of counsel when trial counsel declines to file a motion with a minimal chance of

success."  Commonwealth v. Conceicao, 388 Mass. 255, 264 (1983).
In Illinois v. Perkins, 496 U.S. 292, 297 (1990), the United
States Supreme Court, focusing on the Fifth Amendment, rejected
the argument the defendant makes here.  The Court emphasized
that Miranda sought to protect or preserve a suspect's ability
to exercise his right against self-incrimination in the
"inherently compelling" atmosphere of a police-dominated
official interrogation, and concluded that under the Fifth
Amendment, incriminating statements made during a voluntary
conversation between a suspect who was incarcerated on other
charges and his cellmate -- an undercover officer posing as an
inmate -- were not rendered inadmissible because of the absence
of Miranda warnings.[10]  Id. at 296, quoting Miranda, 384 U.S. at

---

[10] The Supreme Court reasoned:

"Conversations between suspects and undercover agents
do not implicate the concerns underlying Miranda.  The
essential ingredients of a 'police-dominated atmosphere'
and compulsion are not present when an incarcerated person
speaks freely to someone whom be believes to be a fellow
inmate.  Coercion is determined from the perspective of the
suspect. . . .  When a suspect considers himself in the
company of cellmates and not officers, the coercive
atmosphere is lacking. . . .

"It is the premise of Miranda that the danger of
coercion results from the interaction of custody and
official interrogation.  We reject the argument that
Miranda warnings are required whenever a suspect is in
custody in a technical sense and converses with someone who
happens to be a government agent.  Questioning by captors,
who appear to control the suspect's fate, may create
mutually reinforcing pressures that the Court has assumed

467.  The defendant in essence disagrees with the reasoning of the Court's majority in Perkins, cites to the dissenting opinion of Justice Marshall, and urges us to conclude that under art. 12, the administration of Miranda warnings was required before Almeida, who was in substance a government agent, engaged the defendant in conversation about the circumstances of the victim's murder.  See Perkins, 496 U.S. at 303 (Marshall, J., dissenting).  In support of this position, the defendant points out that in the context of Miranda, the court in certain cases has construed art. 12 of the Declaration of Rights to afford more protections to suspects of crimes.

In Commonwealth v. Larkin, 429 Mass 426, 432 (1999), quoting Perkins, 496 U.S. at 297, this court observed that "Miranda warnings are only necessary where one is the subject of 'custody and official interrogation.'"[11]  We also stated that

_____

        will weaken the suspect's will, but where a suspect does
        not know that he is conversing with a government agent,
        these pressures do not exist."  (Citations omitted.)

Illinois v. Perkins, 496 U.S. 292, 296-297 (1990).

        [11] In Commonwealth v. Larkin, 429 Mass. 426, 427 (1999), the defendant, who was being held in custody at a house of correction in connection with an outstanding probation surrender warrant, agreed to be questioned by police officers about an unrelated homicide.  The court concluded that although the interrogating officers ultimately gave the defendant Miranda warnings, the administration of warnings was not required because "the circumstances of the interview were in the special Miranda sense noncustodial."  Id. at 435.  The defendant was not under the control of the officers investigating him, and

"[w]hether a suspect was subject to custodial interrogation is a question of Federal constitutional law." Larkin, supra at 432. Although on occasion, we have interpreted art. 12 to afford greater protections to criminal suspects than the Fifth Amendment, see, e.g., Commonwealth v. Mavredakis, 430 Mass. 848, 858 (2000), we are not persuaded that this case presents a ground to do so.[12] In other words, considering the purpose of Miranda warnings, we find no good reason to conclude that where an unindicted suspect held in custody on separate charges enters voluntarily into a conversation with a cellmate, art. 12 requires that the suspect receive Miranda warnings before the

_____

although he could not leave the house of correction, he was free to end the interview at any time. Id. at 435-436. See Maryland v. Shatzer, 559 U.S. 98, 112-113 (2010). Contrast Commonwealth v. Mercado, 466 Mass. 141, 147-149 & n.9 (2013) (defendant, held in custody in Puerto Rico on local charges and permitted relatively free movement, was brought without notice to Federal Bureau of Investigation office and questioned in handcuffs by police officers about Massachusetts murder for two hours with no Miranda warnings given; interview may have been custodial).

Without question, the facts of Larkin are different from the facts in this case, but the court's discussion of what a "custodial interrogation" means for purposes of Miranda warnings cites and is consistent with the Supreme Court's reasoning in Perkins, 496 U.S. at 296-297.

[12] We have broadened art. 12 protections where a defendant made incriminating statements to an undercover informant in his jail cell after his right to counsel under the Sixth Amendment to the United States Constitution had attached. See Commonwealth v. Murphy, 448 Mass. 452, 453 (2007). However, in the present case, the defendant's Sixth Amendment right to counsel had not been triggered because at the time of his conversation with Almeida, he had not been indicted or charged in connection with the victim's murder.

conversation begins if it turns out that the cellmate was acting as an agent of the police.[13]

Here, the defendant was not in custody for Miranda purposes during his jail cell conversation with Almeida.  Although Almeida was deliberately eliciting information from him, the defendant was not being coerced to answer in any way.  Rather, he was having a conversation with someone he knew and appeared to consider a friend, and there is nothing to indicate his statements were anything but voluntary.  See Commonwealth v. Tremblay, 460 Mass. 199, 207 (2011).  Because there was no basis on which to argue that evidence of the conversation should have been suppressed under the Fifth Amendment or art. 12, the defendant's trial attorney was not ineffective in failing to raise the claim.  The defendant's motion for a new trial was properly denied.

3.  Other issues.  Because there may be a new trial, we briefly address the defendant's two other claims.

First, the defendant asserts that in light of the Commonwealth's failure to provide sufficient evidence to corroborate his statements made during the electronically recorded conversation with Almeida, his motion for a required finding of not guilty should have been allowed.  This argument

---

[13] If we were to accept the defendant's position, as a practical matter it would eliminate any conversation with a cooperating witness where a suspect is held in jail.

relies on a misguided application of the corroboration rule, which "requires only that there be some evidence, besides the confession, that the criminal act was committed by someone, that is, that the crime was real and not imaginary." Commonwealth v. Forde, 392 Mass. 453, 458 (1984). It is not necessary that the corroborating evidence "point to the accused's identity as the doer of the crime." Id. In a murder case, the additional evidence "need only tend to show that the alleged victim is dead." Id. The victim in this case was clearly killed as a result of multiple gunshot wounds. There is therefore no issue whether the crime of murder occurred.[14] There was no error in the denial of the defendant's required finding motion.

The defendant also argues that his motion to suppress evidence of his recorded telephone call with his brother, recorded in 2004 while he was a pretrial detainee in a Bristol County correctional facility, was improperly denied, and evidence of that recorded call should not have been admitted at trial.[15] Specifically, he asserts that the subpoena was issued

---

[14] Furthermore, even if evidence pointing to the accused's identity were to be required under this rule, the Commonwealth did provide some corroborating evidence potentially linking the defendant with the crime, including the baseball cap found at the crime scene that matched with the defendant's deoxyribonucleic acid, and the shell casing from Payne's car that matched the type of weapon used to shoot the victim.

[15] The table of contents in the defendant's brief contains a heading that contends that the recording violated the

in violation of the procedural requirements of Commonwealth v. Odgren, 455 Mass. 171 (2009). See id. at 184-185 (Commonwealth must obtain judicial approval under Mass. R. Crim. P. 17 [a] [2], 378 Mass. 885 [1979], before issuing subpoena requiring third party to produce telephone records in advance of trial).

It is true that the procedural requirements spelled out in Odgren were not followed here -- Odgren had not been decided when the subpoena was served -- but as that case makes clear, suppression of evidence of recorded telephone calls such as the call at issue here is warranted only where the defendant can show that the erroneously issued subpoena caused him prejudice. See id. at 188-189. See also Commonwealth v. Cote, 407 Mass. 827, 833 (1990).

There was no prejudice shown here. The Bristol County district attorney's office served a subpoena for the defendant's recorded telephone calls on the Bristol County sheriff on October 5, 2009, without seeking prior judicial approval. On or about October 13, 2009, and in accordance with its policy, the sheriff's office delivered to the district attorney's office a copy of the recording of the defendant's telephone calls made in

---

defendant's constitutional right to privacy, but the brief itself contains no argument on this point. The defendant has waived the point. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). In any event, there is no merit to his claim. Matter of a Grand Jury Subpoena, 454 Mass. 685, 688-693 (2009).

November, 2004. The defendant received a copy on October 7, 2010. The trial did not begin until a month later, a period of time that allowed the defendant and his counsel to prepare.[16,17] See Odgren, 455 Mass. at 188.

3. Conclusion. The defendant's conviction is reversed, the verdict is set aside, and the case is remanded to the Superior Court for a new trial.

So ordered.

---

[16] At the hearing on the defendant's motion to suppress evidence of the recorded telephone call, the judge offered a continuance to the defendant in order to provide more time to prepare, but the defendant did not accept the offer.

[17] The defendant makes no claim of prejudice on a substantive level -- e.g., a claim that if the Commonwealth had filed a motion under Mass. R. Crim. P. 17 (a) (2) seeking judicial approval to summons the recording of the telephone call, a judge might well have denied the motion on the ground that the materials sought were not "evidentiary and relevant." See Commonwealth. v. Lampron, 441 Mass. 265, 269-270 (2004) (citation omitted). We have considered the issue, however, pursuant to G. L. c. 278, § 33E. The subpoena itself is not included in the record before us, but it appears from other record materials that the November, 2004, recordings were sought because the Commonwealth had information that these recorded conversations would include information relating to the 2004 Lopes murder and may pertain to the issue of motive in connection with the victim's murder in 2005. In these circumstances, the recordings would appear to be both evidentiary and relevant, and a motion for approval of a summons or subpoena for those records was highly likely to have been allowed.

GANTS, C.J. (concurring, with whom Spina, J., joins). In Commonwealth v. Tavares, 459 Mass. 289, 303 (2011) (Gants, J., concurring), I concurred with the court's conclusion "that the information in the electronic surveillance affidavit, while it provided probable cause to believe that the defendant had committed a murder and that the requested oral interceptions would provide evidence of the defendant's participation in the murder, did not provide the required reasonable suspicion that the murder was 'in connection with organized crime.'" I wrote separately in that case to highlight that the legislative inclusion of five words in the statutory language in G. L. c. 272, § 99, "in connection with organized crime," "means that electronic surveillance is unavailable to investigate and prosecute the hundreds of shootings and killings committed by street gangs in Massachusetts, which are among the most difficult crimes to solve and prosecute using more traditional means of investigation." Id. at 305. I added, "If the Legislature wishes to avoid this result, it should amend § 99 to delete those words." Id. To date, no such amendment has been enacted.

The reversal of the convictions in this case is a consequence of the inclusion of those five words.[1] There is no

---

[1] To be fair, even prompt legislative action to address this issue after the issuance of the opinion and concurrence in

reason to believe that the plague of retaliatory shootings by teenagers and young men belonging to street gangs that are not committed "in connection with organized crime" has materially abated since the concurrence in Tavares was issued, or that those shootings have become any easier to investigate or prosecute.  Nor is there any reason to believe that the consequence of those five words can be measured solely by the number of murder convictions that are reversed.  No doubt, for every conviction reversed on this ground, there are many more cases that are never indicted or that fall short of conviction because the evidence that may be obtained from oral interceptions, including those intercepted with one-party consent, cannot be obtained in compliance with § 99.

I agree with the court's reasoning and its judgment, based on the language of § 99.  I concur only to reiterate that only the Legislature can change that language.

---

Commonwealth v. Tavares, 459 Mass. 289 (2011), would not have prevented the reversal of the convictions in this case, because the one-party consent recording took place in 2009.